**CENTRAL FLORIDA ENTERPRISES, INC., Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee.**

Cowles Broadcasting, Inc., Intervenor.

No. 76–1742.

United States Court of Appeals, District of Columbia Circuit.

Argued 6 June 1978.

Decided 25 Sept. 1978.

As Amended on Denial of Rehearing and Rehearing En Banc 12 Jan. 1979.

Certiorari Dismissed May 17, 1979. See 99 S.Ct. 2189.

Joseph F. Hennessey, Washington, D. C., with whom Lee G. Lovett and Richard C. Rowlenson, Washington, D. C., were on the brief, for appellant.

Daniel M. Armstrong, Associate Gen. Counsel, Washington, D. C., with whom Robert R. Bruce, Gen. Counsel and Jack David Smith, Counsel F. C. C., Washington, D. C., was on the brief, for appellee.

Robert A. Marmet, Washington, D. C., with whom Harold K. McCombs, Jr., Washington, D. C., was on the brief, for intervenor, Cowles Broadcasting, Inc.

Edward J. Kuhlmann, Washington, D. C., was on the brief for amicus curiae urging the Commission's decision to be reversed and remanded.

Before ROBINSON and WILKEY, Circuit Judges, and FLANNERY,* District Judge for the United States District Court for the District of Columbia.

Opinion for the Court filed by Circuit Judge WILKEY.

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

OUTLINE OF OPINION

|  |  | Page |
|---|---|---|
| I. | ISSUES IN COMPARATIVE RENEWAL PROCEEDINGS, PAST AND PRESENT | 40 |
| II. | THE COURSE OF THE LITIGATION | 44 |
|  | A. The Initial Decision | 45 |
|  |    1. Designated Issues | 45 |
|  |       a. The Main Studio Move | 45 |
|  |       b. Mail Fraud | 45 |
|  |    2. Standard Comparative Issues | 46 |
|  |       a. Diversification of Media Ownership | 46 |
|  |       b. Best Practicable Service | 46 |
|  |          (1) Integration of Ownership and Management | 46 |
|  |          (2) Cowles' Past Service | 47 |
|  |       c. The Public Interest Finding on the Two Standard Comparative Issues | 47 |
|  | B. The Commission Decision | 47 |
| III. | ANALYSIS | 49 |
|  | A. The Designated Issues | 51 |
|  |    1. The Main Studio Move | 51 |
|  |    2. The Mail Fraud Issue | 52 |
|  | B. Standard Comparative Issues | 53 |
|  |    1. Diversification | 53 |
|  |    2. Best Practicable Service | 54 |
|  |       a. Integration | 55 |
|  |       b. Cowles' Past Performance | 56 |
| IV. | CONCLUSION | 58 |

[OPINION ON PETITION FOR REHEARING   PAGE 58]

WILKEY, Circuit Judge:

Appellant, Central Florida Enterprises, Inc. (Central), appeals a decision and accompanying orders by the Federal Communications Commission (Commission) denying its application for a construction permit for a new commercial television station to operate on Channel 2 in Daytona Beach, Florida, and granting the mutually exclusive application for renewal of license to Intervenor Cowles Florida Broadcasting, Inc. (Cowles).[1] Appellant contends that the Commission acted unreasonably and without substantial record support in preferring Cowles' renewal application. We agree, vacate the Com-mission's orders, and remand for further proceedings.

### I. ISSUES IN COMPARATIVE RENEWAL PROCEEDINGS, PAST AND PRESENT

What is at issue here is the validity of the process by which the competing applications of Central and Cowles were compared and the adequacy of the Commission's articulated rationale for its choosing to renew Cowles' license. This may well be a typical comparative renewal case, hence the careful scrutiny we give the Commission's procedure and rationale herein.

---

1. *Cowles Florida Broadcasting, Inc.*, 60 F.C.C.2d 372 (1976), *reconsideration denied and clarified*, 62 F.C.C.2d 953 (1977), *reconsidera-*tion denied, 40 Rad.Reg.2d 1627 (1977) (P–H). The jurisdiction of this court is properly invoked pursuant to 47 U.S.C. § 402(b) (1970).

■ Aside from the specific facts of this case, there is other evidence indicating the state of administrative practice in Commission comparative renewal proceedings is unsatisfactory.[2] Its paradoxical history reveals an ordinarily tacit presumption that the incumbent licensee is to be preferred over competing applicants.[3] Because the Federal Communications Act fairly precludes any preference based on incumbency *per se*,[4] the practical bias arises from the Commission's discretionary weighing of legally relevant factors.[5] Of course, the general preference, and a *fortiori* the disposition in any given instance, may be a lawful exercise of the Commission's "substantive discretion." However, it is the judicial function to insure that such discretionary choices as are entailed in these proceedings are rigorously governed by traditional principles of fairness and administrative regularity.

Comparative analysis is implicit in any scheme of allocation and has always been at least formally a consideration in broadcast licensing. The procedural setting for such a comparative review is the licensing hearing provided by Section 309(e) of the Communications Act.[6] The Supreme Court held in *Ashbacker Radio Corp. v. FCC*[7] that under Section 309(e) where two or more applications are mutually exclusive there must be a joint comparative hearing. This court had occasion to elaborate what is entailed by such a "full hearing" in *Greater Boston Television Corp. v. FCC*:

> [T]he findings must cover all the substantial differences between the applicants and the ultimate conclusion must be based on a composite consideration of the findings as to each applicant.[8]

Although *Ashbacker* dealt with two original applications, this court and the Commission have consistently held that the doctrine governs renewal proceedings as well.[9]

A less tractable matter has been the question of the substantive criteria to as-

**2.** *See generally Fidelity Television, Inc. v. FCC*, 169 U.S.App.D.C. 225, 246–58, 515 F.2d 684, 705–17 (Bazelon, C. J.) (voting to grant rehearing en banc), *cert. denied*, 423 U.S. 926, 96 S.Ct. 271, 46 L.Ed.2d 253 (1975); *Citizens Communications Center v. FCC*, 145 U.S.App.D.C. 32, 37–41, 447 F.2d 1201, 1206–10 (1971), *clarification granted*, 149 U.S.App.D.C. 419, 463 F.2d 822 (1972); *Cowles Florida Broadcasting, Inc.*, 60 F.C.C.2d 372, 435–42 (1976) (Commissioner Robinson, dissenting); Geller, *The Comparative Renewal Process in Television: Problems and Suggested Solutions*, 61 Va.L.Rev. 471 (1975).

**3.** *See* note 17 *infra*.

**4.** The Communications Act of 1934 included language expressly referring the decision to renew a license to "the same considerations and practice which affect the granting of original applications," ch. 652, § 307(d), 48 Stat. 1084 (1934). Apparently to preclude the inference that an incumbent could not adduce evidence of its past broadcast record, Congress in 1952 deleted the language subjecting renewal applicants to "the same considerations and practice" as original applicants and substituted the present language subjecting all applications to the standard of "public interest, convenience, and necessity," 47 U.S.C. § 307(d) (1970). *See Citizens Communications Center v. FCC*, 145 U.S.App.D.C. at 37–38 and n.13, 447 F.2d at 1206–07 and n.13. *But see Report of the Federal Communications Commission to the Subcommittee on Communications of the Committee on Interstate and Foreign Commerce of the House of Representatives Re the Comparative Renewal Process*, Joint Appendix (J.A.) at 172, 182 (1976) [hereinafter cited as *Report*] (suggesting that the 1952 amendment may have codified the Commission's informal presumption of renewal). The Communications Act contains numerous other passages suggesting that the grant of a license creates no preferential rights in the incumbent, providing, *inter alia*, that "no . . . license shall be construed to create any right, beyond the terms, conditions, and periods of the license," 47 U.S.C. § 301; that an applicant waives any claim to a frequency "because of the previous use of the same," 47 U.S.C. § 304; that no license granted "shall be for a longer term than three years," 47 U.S.C. § 307(d); and that a license does "not vest in the licensee any right . . . in the use of the frequencies . . . beyond the term thereof," 47 U.S.C. § 309(h) (1970). *See also FCC v. Sanders Bros. Radio Station*, 309 U.S. 470, 475, 60 S.Ct. 693, 84 L.Ed. 869 (1940).

**5.** *See* pp. ———–——— of 194 U.S.App.D.C., pp. 50 -51 of 598 F.2d *infra*.

**6.** 47 U.S.C. § 309(e) (1970).

**7.** 326 U.S. 327, 333, 66 S.Ct. 148, 90 L.Ed. 108 (1945).

**8.** 143 U.S.App.D.C. 383, 393, 444 F.2d 841, 851 (1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971) (footnote omitted).

**9.** *See Citizens Communications Center v. FCC*, 145 U.S.App.D.C. at 42, 447 F.2d at 1211.

sure a fair comparison. The development of those criteria has been committed largely to the discretion of the Commission, with occasional and quite general guidance from the courts, as in *Greater Boston, supra.* The standards, evolved gradually over the course of the Commission's comparative proceedings, were reviewed and restated in the *1965 Policy Statement on Comparative Broadcast Hearings.*[10] Logically, criteria for comparison should be derived from and relate to the defined *objectives* of the comparative hearing. The Commission so proceeded, identifying in the Policy Statement the primary *objectives* of the comparative hearing as "the *best practicable service* to the public" and the "*maximum diffusion of control* of the media of mass communication."[11] The principal factors relevant to the "best practicable service" issue were the extent of participation of owners in station management, programming proposals, past broadcast record, technical capacity, and character.[12] Diversification of ownership of the mass media was described as being "of primary significance."[13] Further, upon an appropriate showing, the parties could raise any other relevant factors.

The applicability of the Commission's usual comparative criteria to comparative *renewal* proceedings has been uncertain. The fact of incumbency without more would appear legally irrelevant under the statute.[14] Although the *1965 Policy Statement* pretermitted "the somewhat different problems raised when an applicant is con-

testing with a licensee seeking renewal of license,"[15] the Commission subsequently held that the 1965 Policy Statement "should govern the introduction of evidence in this and similar proceedings where a renewal application is contested."[16] The weight given to the 1965 criteria would still depend on the facts of each case.

Despite the apparent statutory assurance of a freewheeling inquiry into the relative merit of challenger and incumbent licensee, the history of Commission practice reveals a strong preference for renewal.[17] Further, until fairly recently, such choices by the Commission were routinely affirmed by this court.[18] This general phenomenon has been rationalized into what we have called on occasion "a renewal expectancy."[19] The question arises, material in this case, to what extent such an expectancy is compatible with the full hearing guaranty of Section 309(e). This was essentially the question we confronted in *Citizens Communication Center v. FCC.*[20] There we struck down the Commission's 1970 *Policy Statement Concerning Comparative Hearings Involving Regular Renewal Applicants*[21] because it foreclosed the fully comparative inquiry mandated by the statute as construed in *Ashbacker.* Under that Policy Statement, if there were a showing of past "substantial service," a licensee would be renewed without consideration of comparative issues. *Citizens* thus stands for the proposition that "the Commission may not use renewal expectancies of incumbent li-

---

10. 1 F.C.C.2d 393 (1965) [hereinafter cited as *1965 Policy Statement*].

11. *Id.* at 394.

12. *Id.* at 395–98.

13. *Id.* at 395.

14. *See* note 4 *supra.*

15. *1965 Policy Statement, supra* note 10, at 393 n.1.

16. *Seven (7) League Productions, Inc. (WIII),* 1 F.C.C.2d 1597, 1598 (1965).

17. *See Citizens Communication Center v. FCC,* 145 U.S.App.D.C. at 38–40, 447 F.2d at 1207–

09; *Wabash Valley Broadcasting Corp. (WTHI–TV),* 35 F.C.C. 677 (1973); *Hearst Radio, Inc. (WBAL),* 15 F.C.C. 1149 (1951).

18. *See Citizens Communications Center v. FCC,* 145 U.S.App.D.C. at 39 n.23, 447 F.2d at 1208 n.23.

19. *See id.* 145 U.S.App.D.C. at 44 n.35, 447 F.2d at 1213 n.35; *Greater Boston Television Corp. v. FCC,* 143 U.S.App.D.C. 396, 400, 444 F.2d at 854, 858.

20. 145 U.S.App.D.C. 32, 447 F.2d 1201 (1971).

21. 22 F.C.C.2d 424 (1970).

censees to shortcircuit the comparative hearing." [22]

We did note the relevance of the incumbent's past performance:

We do not dispute, of course, that incumbent licensees should be judged primarily on their records of past performance. Insubstantial past performance should preclude renewal of a license. . . . At the same time, superior performance should be a plus of major significance in renewal proceedings. . . . The Court recognizes that the public itself will suffer if incumbent licensees cannot reasonably expect renewal when they have rendered superior service.[23]

▮ Despite the language in *Citizens,* it is fair to say that the law governing comparative renewal proceedings remained unclear. Although *Ashbacker* had said a challenger could not be denied a hearing and *Citizens* apparently assured some kind of substantive comparison, the nature of the inquiry and the pertinence of "renewal expectancies" was left uncertain.

As an original matter, of course, a "renewal expectancy" could be shorthand for any of several plausible theories of the public interest standard contained in section 309. For example, expectations *could* be confined to the likelihood that an incumbent would prevail under the customary 1965 criteria without any special regard for the quality of its past performance one way or the other. It would hardly be sensible, however, to ignore the past, for it affords the "best evidence" of what the incumbent's future performance will be, and it has never been the Commission's practice to do so. Conceding therefore, that an incumbent's past performance is highly relevant, an incumbent with a meritorious record would possess a natural advantage insofar as its actual performance made its proposals more credible than the "paper promises" of a challenger. Some such comparative as-

sessment of *likely* performances would, in fact, seem inescapable. It would then follow naturally from discounting the promises of challengers that incumbents would prevail more often, thereby assuring more "continuity" in the industry. The certainty thus afforded a meritorious incumbent through its natural comparative advantage may in turn induce it to commit enough resources to perpetuate its quality of service. An expectation raised by the probability of prevailing in the overall inquiry is, of course, fully compatible with the comparison assured by section 309.

We understand the Commission's present idea of renewal expectancies may be more expansive—that an "expectancy" may be generated by something less than or different from more meritorious service. An incumbent is said entitled to expect renewal if it has "served the public interest in . . a substantial manner." Apparently, a "substantial" past record would be a factor weighed in the incumbent's favor *irrespective* of which applicant were predicted to perform better in the future. Such an entitlement would be provided to promote security directly and to induce investment which otherwise may not be made. Whether and in what manner placing such a thumb on the balance in an otherwise comparative inquiry may be reasonable are, we think, open and difficult questions.

In a number of cases before and after *Citizens* this court has had occasion to refer to renewal expectancies without much inquiry into the notion's content. Thus, in dictum in *Greater Boston Television Corp. v. FCC,* we observed there were "legitimate renewal expectancies implicit in the structure of the Act." We said that "such expectancies are provided in order to promote security of tenure and to induce efforts and investments, furthering the public interest.[24] In 1975, in our *Fidelity Television* opinion, confronted with a weak licensee and a weak contender, both only "minimally

**22.** *Fidelity Television, Inc. v. FCC,* 169 U.S. App.D.C. at 246, 515 F.2d at 705, 709 (Bazelon, C. J.) (voting for rehearing en banc).

**23.** *Citizens Communication Center v. FCC,* 145 U.S.App.D.C. at 44 and n.35, 447 F.2d at 1213 and n.35.

**24.** 143 U.S.App.D.C. at 396, 444 F.2d at 854.

acceptable applicants," we said "when faced with a fairly and evenly balanced record, the Commission may on the basis of the renewal applicant's past performance, award him the license." [25]

Finally, last term the Supreme Court observed, in the context of reviewing the FCC's regulations barring certain newspaper-broadcast combinations, that industry stability has consistently been a concern in comparative renewal proceedings. It said:

> In the past, the Commission has consistently acted on the theory that preserving continuity of meritorious service furthers the public interest, both in its direct consequence of bringing proven broadcast service to the public, and in its indirect consequence of rewarding—and avoiding losses to—licensees who have invested the money and effort necessary to produce quality performance. Thus, although a broadcast license must be renewed every three years, and the licensee must satisfy the Commission that renewal will serve the public interest, both the Commission and the courts have recognized that a licensee who has given meritorious service has a 'legitimate renewal expectanc[y]' that is 'implicit in the structure of the Act' and should not be destroyed absent good cause. *Greater Boston Television Corp. v. FCC,* 143 U.S.App. D.C. 383, 444 F.2d 841, 854 (1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971); see *Citizens Communications Center v. FCC,* 145 U.S.App. D.C. 32, 44 and n.35, 447 F.2d 1201, 1213 and n.35 (1971); Formulation of Policies Relating to the Broadcast Renewal Applicant, Stemming From the Comparative Hearing Process, [66 F.C.C.2d at 420].[26]

Thus, although not a precise concept, renewal expectancies derived from "meritorious service" (to use the Supreme Court's terminology) are a natural aspect of the public interest inquiry carried on under section 309(e). Moreover, "the weighing of policies under the 'public interest' standard is a task that Congress has delegated to the Commission in the first instance." [27]

## II. THE COURSE OF THE LITIGATION

Intervenor Cowles has operated its station, WESH–TV, on Channel 2 in Daytona Beach since it purchased the station in 1966. On 31 October 1969 Cowles filed its application for renewal of license. Central submitted its competing application for a construction permit for a new television station to operate on the same channel on 2 January 1970. The two applications were set for hearing by Commission order released 10 March 1971, and redesignated by orders released 20 August 1971 and 24 February 1972.

In addition to inquiry into diversification of media ownership and "best practicable service," which comprise the customary comparative issues, certain special issues were designated for hearing. These were (a) whether contrary to Commission regulation, Cowles had moved its main studio without prior Commission approval; and (b) whether alleged mail fraud by five related corporations supported inferences adverse to Cowles' character.[28] Following extensive findings, the Administrative Law Judge (ALJ) concluded that renewal of Cowles' license would best serve the public interest.[29] By a 4–3 vote the Commission affirmed with certain modifications.[30]

The facts in this case are essentially undisputed, and will be recounted only incidentally to our review of the Commission's decision.

---

**25.** 169 U.S.App.D.C. at 243, 515 F.2d at 702.

**26.** *FCC v. National Citizens Committee for Broadcasting,* 436 U.S. 775, 805–806, 98 S.Ct. 2096, 2117–2118, 56 L.Ed.2d 697 (1978) (footnotes omitted).

**27.** Id. at 810, 98 S.Ct. at 2120.

**28.** Certain other designated issues, dealing with engineering and financial matters, are not at issue here.

**29.** *Cowles Florida Broadcasting, Inc.,* F.C.C. 73D–62 (Released 7 Dec. 1973) [hereinafter cited as *Initial Decision* ], J.A. at 78.

**30.** *See* note 1 *supra.*

## A. *The Initial Decision*

### 1. *Designated Issues.*

#### a. The Main Studio Move

Commission rules require that "[t]he main studio of a television broadcast station shall be located in the principal community to be served."[31] WESH–TV's city of assignment is Daytona Beach, and the station had always had a studio just outside the city at Holly Hill. In addition, WESH–TV maintained "auxiliary" studios in Winter Park, just outside Orlando. Since 1960, the station had been authorized to identify as a Daytona Beach-Orlando station, although the Commission stressed that Daytona remained the city of assignment and "principal city." The rule prescribing the location of the "main" studio, unlike the analogous rules governing radio stations,[32] contains no definition of "main" studio and there is little clarifying precedent.

Still, the ALJ found "inescapably" that "Cowles treats its Winter Park [Orlando] facility as its principal place of business."[33] Because there had been an unauthorized move of the "main studio" contrary to rule, the ALJ gave Cowles a comparative demerit.[34] However, the demerit was not given much weight in light of what the ALJ considered to be mitigating factors. First, the ALJ stressed that there was "little evidence that the move resulted from a deliberate corporate decision to move the main studio in defiance of the Commission's rules." Rather, a "series of changes" responding to the "commercial lure" of Orlando, resulted in a "de facto move of the main studio."[35] Second, the ALJ concluded that "the unauthorized move had not resulted in the downgrading of service to the community of assignment which [the rule] is designed to prevent."[36]

#### b. Mail Fraud

Cowles is a wholly owned subsidiary of Cowles Communications, Inc., (CCI). During the license period CCI also published Look Magazine and owned five other subsidiaries, each in the business of obtaining magazine subscriptions. The five subsidiaries conducted so-called "paid during service" (PDS) operations in which subscribers paid installments of the purchase price over the life of the subscription.

After a few years, complaints arose of improper sales and collection practices by the PDS companies. When CCI became aware of the problem, it promulgated a code of practice for the subsidiaries to cure the abuses. Despite these efforts, the practices continued and by the fall of 1969 the PDS companies were under investigation by various state and federal agencies. In 1970, after being informed that the Justice Department intended to investigate the entire PDS industry, CCI initiated negotiations which resulted in *nolo contendere* pleas by the five PDS subsidiaries to fifty counts of mail fraud, and a consent decree against the five companies, guaranteed by CCI, enjoining specific sales and collection practices.

With respect to Cowles' parent, CCI, the ALJ reached conclusions that he characterized as "harsh."[37] He found that CCI acquired operations which "it must have realized" would be inclined to massive fraud. CCI's supervision was "spotty" and "ineffectual," its internal investigation coming "late in the day" when it recognized "that various governmental agencies were about to call it to account." It was "inconceivable that it could have . . . been unaware" of such corruption "unless it chose to be."[38]

The ALJ concluded, however, that Cowles was insulated from these "harsh" findings

---

**31.** 47 C.F.R. 73.613 (1977).

**32.** 47 C.F.R. 73–210 (1977) (FM stations); 47 C.F.R. 73.30 (1977) (AM stations).

**33.** *Initial Decision* ¶ 181, J.A. at 130.

**34.** *Id.* ¶ 203, J.A. at 136.

**35.** *Id.* ¶ 182, J.A. at 131.

**36.** *Id.* ¶ 183, J.A. at 131.

**37.** *Id.* ¶ 185, J.A. at 132.

**38.** *Id.* ¶ 184, J.A. at 131–32.

concerning its parent. Although the ALJ supposed such evidence of fraud would probably disqualify an original applicant, the findings in this case were not "decisionally material" in light of Cowles' broadcast record which better predicts future performance. Consequently, it was "unnecessary to attempt to draw inferences from the nonbroadcast conduct of CCI and its non-broadcast subsidiaries;" and "no conclusions adverse to the character qualifications of [Cowles] should be reached on the basis of that issue." [39]

On the two specially designated issues, the main studio move and the mail fraud inquiry, by the ALJ's reasoning Cowles escaped unscathed.

### 2. Standard Comparative Issues.

#### a. Diversification of Media Ownership

The ALJ concluded that "the advantage lies with Central" under the diversification factor because it had "no connection of any sort with any other mass media outlet." [40] Cowles' parent, CCI, owned an AM–FM–TV combination in Des Moines, Iowa, and another CCI subsidiary owned AM and FM radio stations in Memphis, Tennessee. While these interests were "remote" from Daytona Beach, the ALJ held that they remained a "significant factor in the ultimate choice." [41] The ALJ further noted that CCI owned a substantial stock interest in the New York Times Company, which publishes the *New York Times* and has extensive publishing and broadcast holdings. Gardner Cowles, Chairman of CCI, was then a director of the New York Times Company. In addition, certain CCI stockholders had substantial mass media interests. The Des Moines Register and Tribune Company owned 9% of CCI's stock and had an 11% stock interest in the Minneapolis Star and Tribune Company. But the ALJ concluded these related mass media interests were of "little decisional significance"

because CCI did not control the New York Times Company, nor did the Des Moines Register and Tribune Company control CCI. Thus, no potential existed for compelling the media involved to "speak with a common voice," and the basic policy underlying the diversification standard was "not disserved." [42]

The ALJ then concluded that although Central's advantage was "clear," it would not be "compelling" unless Central were shown likely to render public service "at least as good" as that of Cowles. [43] This was especially true in the present context where renewal "would not increase the existing concentration of control." The ALJ found that Cowles' incumbency evinced a prior Commission determination that its media connections were not contrary to the public interest. Moreover, the ALJ noted the Commission's reluctance to employ comparative renewal proceedings to restructure the broadcast industry. In his view, the benefits from increased diversification had to be balanced against the public necessity of a stable broadcast industry. Accordingly, the ALJ concluded that a comparative renewal hearing should occasion an increase in diversification only if the competing applicant appeared likely to render service at least as good as that which the public had been receiving.

#### b. Best Practicable Service

Under the criterion of "best practicable service" the ALJ made findings with respect to two matters: (1) Central's proposals regarding the participation of owners in the station management; and (2) the quality of Cowles' past service.

##### (1) Integration of Ownership and Management

The ALJ found Central's integration proposals to be "very weak," and concluded that Central's owners would probably not play more than a nominal role in station

**39.** *Id.* ¶ 186, J.A. at 132.

**40.** *Id.* ¶ 193, J.A. at 133–34.

**41.** *Id.*

**42.** *Id.* ¶ 194, J.A. at 134.

**43.** *Id.* ¶ 195, J.A. at 134.

affairs.[44]   He noted full time participation by station owners is of substantial importance under the 1965 criteria.   But here, full time participation was proposed by only three of Central's shareholders, collectively owning 10.5% of Central's stock.   While "not inconsequential," this ownership interest was not sufficient to control corporate policy.   Further, the proposed integration was largely temporary.   The important positions of General Manager and Program Director would be held by Mr. Stead and Mrs. Goddard, respectively, but Stead would serve only in Central's "formative stages," and Mrs. Goddard only until the station were "thoroughly organized and stabilized." The ALJ consequently found it unlikely that the benefits of integration would continue throughout the license period.   Moreover, the shareholders' lack of broadcast experience, ordinarily unimportant because remediable, became significant in light of the limited tenure contemplated.   In sum, the ALJ found that full time integration of management and ownership would be limited to Mr. Chambers, a 3.5% stockholder who would be supervisor of Administration.   His duties were undefined and nothing indicated that he would be involved in determining the nature or content of program service.

The ALJ conceded several of Central stockholders would participate in management on a part-time basis, primarily as consultants, but noted that little weight attached to such participation under the *Policy Statement*.   In his view, part-time contributions by those who are "essentially dilletantes" rarely has a material effect on overall station operations.

### (2) Cowles Past Service

The ALJ found that Cowles' past performance had been "thoroughly acceptable." [45]   He observed that Cowles had devel-oped and presented "a substantial number of programs   .   .   .   designed to serve the needs and interests of its community." A number of local residents and community leaders had expressed satisfaction with the station's performance, and there had been no complaints concerning the station's operation.   Moreover, the ALJ found "no reason to believe that future performance would be less satisfactory."   Although the unauthorized move of the main studio warranted a "comparative demerit," since it was not done in bad faith and had not lowered the quality of service to Daytona Beach, it would not support a conclusion that Cowles was unlikely to continue to provide "proper service." [46]

### c.   The Public Interest Finding on the Two Standard Comparative Issues

In the end, the ALJ concluded that Cowles merited a "distinct preference" under the best practicable service criterion and that that preference outweighed Central's preference under the diversification criterion.   The ALJ reasoned that absent a showing that the degree of industry concentration which had existed when Cowles was originally licensed had "actually disserved the public interest," the more compelling objective was obtaining the best practicable service.[47]

### B.   *The Commission Decision.*

The Commission affirmed the decision of the ALJ with certain modifications.   It concluded that the ALJ had correctly disposed of the main studio issue.[48]   Thus, the Commission rejected both Cowles contention that there had been no *de facto* move of the main studio and Central's argument that the finding without more should have disqualified Cowles.   Further, the Commission generally approved the ALJ's treatment of

---

44.   *Id.* ¶ 201, J.A. at 136.

45.   *Id.* ¶ 202, J.A. at 136.

46.   *Id.* ¶ 203, J.A. at 136.

47.   *Id.* ¶ 205, J.A. at 137.   The ALJ gave Cowles a "definite plus" for the superiority of its facilities at Orlando.   *Id.* ¶ 204, J.A. at 137.   This was overturned by the Commission, 60 F.C.C.2d at 416, in light of the impropriety of the *de facto* move which had enhanced those facilities.

48.   60 F.C.C.2d at 398–400.

the factors mitigating the effect of the studio move.

The Commission sustained the ALJ again with respect to the mail fraud issue, finding he had properly refused "to impart decisional significance" to the evidence of wrongdoing. Inasmuch as Cowles was not shown to be implicated in the PDS practices and there appeared to be no criminal case against CCI or its personnel, the Commission declined "to attribute the sins of the PDS's to CCI and then visit them on Cowles' head." [49]

Again, by the Commission's reasoning on the two specially designated issues, Cowles lost no ground. The Commission then turned to the two standard issues, diversification and service.

Reviewing the ALJ's treatment of the diversification issue, the Commission affirmed the award of a preference, finding Central's advantage "clear." [50] The Commission agreed that the significance of the preference was reduced by the fact that CCI's other broadcast and newspaper interests were remote from Daytona Beach and

were not shown to dominate their markets. Moreover, the Commission reiterated its reluctance to use the diversification criterion to restructure the broadcast industry, observing that "the need for industry stability had its own decisional bearing here." In a subsequent order, the Commission expanded its discussion, finding that the autonomy which CCI accorded to the local station management further reduced the significance of Central's preference.[51] Inasmuch as the Commission could find no evidence in the record "that the dangers of concentration . . . exist in this case," the preference was found to be "of little decisional significance." [52]

The ALJ's conclusions with respect to the best practicable service issue were modified in light of this court's *TV–9* decision [53] and the Commission's finding that insufficient weight had attached to Cowles' broadcast record. The Commission held that the minority group participation proposed by Central entitled it to a merit under our *TV–9* decision. Nonetheless, even when considered in conjunction with the merit to which Central was admittedly entitled for

**49.** *Id.* at 405.

**50.** *Id.* at 409.

**51.** 62 F.C.C.2d at 956. Central argues that the Commission was without jurisdiction to reconsider *sua sponte* its earlier disposition of the comparative issues. Brief of Appellant at 6. We disagree. Commission rules permit it to set aside on its own motion any action within 30 days after release of the order. 47 C.F.R. 1.108 (1977). It is Commission practice that the filing of a petition for reconsideration tolls the running of the thirty day period. *See Radio Americana, Inc.*, 44 F.C.C. 2506, 2510–2511 (1961). *See also Old Belt Broadcasting Corp. (WSWS)*, 44 F.C.C. 1826, 1830 n.3 (1959). We believe it is not unreasonable that where, as here, several petitions are consolidated for hearing and decision, a petition for reconsideration of any of the ensuing orders tolls the thirty day period as to all orders in the case. To find otherwise would often result in anomaly and unfairness. Thus the *sua sponte* reconsiderations were timely in this case. The fact that appeal from the original order had already been brought in this court does not independently preclude reconsideration. *See Wrather-Alvarez Broadcasting, Inc. v. FCC*, 101 U.S.App.D.C. 324, 326–27, 248 F.2d 646, 648–49 (1957).

**52.** 62 F.C.C.2d at 957.

**53.** *TV–9, Inc. v. FCC*, 161 U.S.App.D.C. 349, 495 F.2d 929, *cert. denied*, 419 U.S. 986, 95 S.Ct. 245, 42 L.Ed.2d 194 (1974). In *TV–9* we held it was erroneous for the Commission to refuse to accord merit to an applicant for the "ownership and participation" of "its two Black stockholders." *Id.* 161 U.S.App.D.C. at 361, 495 F.2d at 941 (supplemental opinion). *See also Garret v. FCC*, 168 U.S.App.D.C. 266, 272–73, 513 F.2d 1056, 1062–63 (1975).

In our supplemental opinion in *TV–9*, 161 U.S.App.D.C. at 361, 495 F.2d at 941, we distinguished our use of "merit" from "preference." We explained that the latter term was used "to mean a decision by the Commission that the qualifications of a particular applicant in a comparative hearing are superior to those of another applicant with respect to one or more of the issues upon which the grant of a permit or license turns." *Id.* n.2. " 'Merit' or 'favorable consideration,' " we said, "is a recognition by the Commission that a particular applicant has demonstrated certain positive qualities which may but do not necessarily result in a preference." " 'Merit,' therefore, is not a 'preference' but a plus-factor weighed along with all other relevant factors in determining which applicant is to be awarded the preference." *Id.*

integration of ownership and management, the additional merit was not sufficient to outweigh the factors in Cowles' favor under the best practicable service criterion.

Finally, the Commission revised the ALJ's characterization of Cowles' record as "thoroughly acceptable." Finding this phrase "too vague to be meaningful," and not adequately expressing "the outstanding quality of Cowles' past performance," the Commission found that performance to have been "superior" in the sense in which we used the word in our *Citizens* opinion— "justifying a plus of major significance," and inferentially, supporting an expectation of renewal.[54] In a subsequent order, the Commission clarified its use of the word "superior." It had meant that the level of service provided by Cowles was "sound, favorable and substantially above a level of mediocre service which might just minimally warrant renewal."[55] It had not intended to suggest that the performance was exceptional when compared to other stations.

The Commission thus articulated the final and decisive tally:

> The Commission—and the Court—have consistently recognized that a record of past programming performance is the very best indication of future performance. It is for this reason that we make clear that a substantial performance—i. e. sound, favorable—is entitled to legitimate renewal expectancies. Under the circumstances here, this consideration is decisive. Central's preference under the diversification criterion is of little decisional significance and Central is entitled to no preference under the integration criterion. These factors, even considering Cowles' slight demerit for the studio move and Central's merit for the Black

ownership it proposes definitely do not outweigh the substantial service Cowles rendered to the public during the last license period.[56]

## III. ANALYSIS

■ The function of this court in reviewing a Commission decision is, as we have often recounted, a fairly limited one. This is particularly the case when the Commission acts under its broad mandate to license in the public interest. However, within the constraints upon our review, we must insist on adherence to those principles which assure the rule of law. Thus we must be satisfied that the agency has given reasoned consideration to all the material facts and issues;[57] that its findings of fact are supported by substantial evidence;[58] and that if its notion of the public interest changes, that at least it has not deviated from prior policy without sufficient explanation.[59] In general, the agency must engage in reasoned decision-making, articulating with some clarity the reasons for its decisions and the significance of facts particularly relied on. Admittedly, this is not an easy matter in comparative renewal proceedings, "but at least so long as the government uses the forms of adjudication, and does not turn, e. g., to bidding, or even chance   .   .   ., reasoned decision-making remains a requirement of our law."[60]

With this preface, we hold that the Commission acted unreasonably and without substantial record support in this matter and we remand for further proceedings.

■ The Commission's rationale in this case is thoroughly unsatisfying. The Commission purported to be conducting a full hearing whose content is governed by the 1965 *Policy Statement.* It found favorably

---

54. 60 F.C.C.2d at 421–22.

55. 62 F.C.C.2d at 955.

56. *Id.* at 958.

57. *See, e. g., Greater Boston Television Corp. v. FCC*, 143 U.S.App.D.C. at 393, 444 F.2d at 851.

58. *See, e. g., Fidelity Television, Inc. v. FCC*, 169 U.S.App.D.C. at 240, 515 F.2d at 699.

59. *See, e. g., Columbia Broadcasting System, Inc. v. FCC*, 147 U.S.App.D.C. 175, 183, 454 F.2d 1018, 1026 (1971).

60. *Greater Boston Television Corp. v. FCC*, 143 U.S.App.D.C. at 394, 444 F.2d at 852 (footnote omitted).

to Central on each of diversification, integration and minority participation, and adversely to Cowles on the studio move question. Then simply on the basis of a wholly noncomparative assessment of Cowles' past performance as "substantial," the Commission confirmed Cowles' "renewal expectancy." Even were we to agree (and we do not agree) with the Commission's trivialization of each of Central's advantages, we still would be unable to sustain its action here. The Commission nowhere even vaguely described how it aggregated its findings into the decisive balance; rather, we are told that the conclusion is based on "administrative 'feel.'"[61] Such intuitional forms of decision-making, completely opaque to judicial review, fall somewhere on the distant side of arbitrary.

The Commission's treatment of the standard comparative issues—diversification of media ownership and best practicable service—is the most worrisome aspect of this case. The Commission plainly disfavors use of the 1965 criteria in comparative renewal proceedings. This in turn is largely because the Commission dislikes the idea of comparative renewal proceedings altogether[62]—or at least those that accord no presumptive weight to incumbency *per se.*[63] As long as the renewal hearings were carried on in a completely *ad hoc* manner, it was little noticed that they were not really comparative. But the restatement of the comparative criteria in 1965 imposed an orderliness on the inquiry which made it obvious when applicants were not in fact on an equal footing. This would never have been a problem if the Commission had been able to distinguish in its rules between hearings comparing only new applicants and comparative renewal hearings. This it was unable to do and the *1965 Policy Statement* has since governed comparative renewal proceedings more or less by default.[64]

Since the 1965 *Statement* admits little room for a presumption of renewal, the Commission has reconstructed the criteria in a manner creating a *de facto* presumption.[65] Whether justified in precedent or

---

**61.** 60 F.C.C.2d at 422.

**62.** Although we would ordinarily be reluctant to reach such conclusions concerning the Commission's state of mind, it has been extraordinarily candid in this matter. *See Report, supra* note 4, ¶¶ 60–81, J.A. at 213 24, concluding, *inter alia,* "that the comparative renewal process should be abolished." *Id.* ¶ 61, J.A. at 213. *See also Cowles Florida Broadcasting, Inc.,* 60 F.C.C.2d at 430, 433 (Chairman Wiley dissenting) ("[T]he 1965 standards concerning diversification and integration advance no public purpose to which agency is truly committed and, if implemented in a rigorous fashion, could well have a serious destabilizing effect on the broadcast industry to the detriment of the . . . public.")

**63.** Some sort of presumption of renewal was implicit in Commission practice at least until the 1965 *Policy Statement. See* notes 2 and 17 *supra.* The *1970 Commission Policy Statement Concerning Comparative Hearings Involving Regular Renewal Applicants, supra* note 21, which we struck down in *Citizens Communication Center v. FCC,* 145 U.S.App.D.C. 32, 447 F.2d 1201 (1971), expressly adopted a presumption of renewal if "substantial" past service could be shown. Most proposed legislative reforms would enact some such presumption. *See* S. 2004, 91st Cong., 1st Sess. (1969) (bill introduced by Senator Pastore and withdrawn when Commission issued its *1970 Policy State-*

*ment, supra* ); H.R. 13015, § 437(a), 95th Cong., 2d Sess. (1978) ("In any case in which a television broadcasting station submits an application to the Commission for the renewal of a license, the Commission may not consider any competing application for such license in determining whether to renew such license.")

**64.** The Commission abandoned its effort to substitute simple quantitative standards for its ad hoc inquiry under the 1965 criteria in comparative renewal hearings. *See Formulation of Policies Relating to the Broadcast Renewal Applicant, Stemming from the Comparative Hearing Process,* 66 F.C.C.2d 419 (1977), *review pending sub nom. National Black Media Coalition v. F.C.C.,* 191 U.S.App.D.C. 55, 589 F.2d 578 [hereinafter cited as *Formulation of Policies* ].

**65.** *See, e. g., id.* at 430:
  As illustrated most recently in the Daytona Beach, Florida case [this case], the renewal applicant must, therefore, continue to run on its record, and we believe that that record should be measured by the degree to which the licensee's program performance was sound, favorable, and substantially above a level of mediocre service which might just minimally warrant renewal. Where the renewal applicant has served the public interest in such a substantial fashion, it will be

logic, the process has been straightforward and comports at least formally with the requirement of a "full hearing": (1) the criteria of diversification and integration were converted from structural questions (challengers usually prevailed on the simple numbers) to functional questions regarding the consequences of other media ownership and autonomous management (but challengers could rarely show injury to the public service); [66] (2) a finding of "substantial," if not above average, past performance by the incumbent would be given decisive weight; [67] and (3) other comparative or designated issues favoring the challenger would be noted, but would not be dispositive "even in conjunction with other factors," [68] unless pertaining to grievous misconduct by the incumbent.

This usual procedure, we believe, although the Commission nowhere tells us, is essentially what occurred here. The development of Commission policy on comparative renewal hearings has now departed sufficiently from the established law, statutory and judicial precedent, that the Commission's handling of the facts of this case make embarrassingly clear that the FCC has practically erected a presumption of renewal that is inconsistent with the full hearing requirement of § 309(e).

### A. The Designated Issues.

#### 1. The Main Studio Move.

■ The Commission was amply supported in its finding that Cowles moved its main studio from Daytona Beach to Orlando, in violation of FCC regulations. The Commission concluded, however, that this violation was mitigated by two factors: (1) the move was not effected in "deliberate definance" of FCC rules; and (2) Central made no showing that service to Daytona had suffered as a result of the *de facto* move. Consequently, Cowles was given a "slight demerit" for its violation. Apparently even this would overstate the Commission's reaction, for in its original order it appeared to give the violation no weight at all.[69]

■ Admittedly, the choice of remedies and sanctions for violations of Commission rules "is a matter wherein the Commission has broad discretion." [70] Moreover, in exer-

entitled to the "legitimate renewal expectancy" clearly "implicit in the structure of the [Communications] Act." *Greater Boston Television Corporation v. F. C. C., supra,* 143 U.S.App.D.C. at 396, 444 F.2d at 854. Thereafter, we will direct our attention to the comparative factors set forth in the *1965 Policy Statement, supra.* While that policy statement will otherwise govern the introduction of evidence in the comparative renewal proceeding, the weight to be accorded the legitimate renewal expectancy of the incumbent licensee and the significance of other comparative considerations will depend on the facts of the particular case.

If the reader is unable to distinguish this *modus operandi* from prior instances of a renewal presumption attaching to some measure of substantial service, note 59 *supra,* neither are we.

The Commission elsewhere makes equally erroneous statements of the law, using the language of burden of proof. *See* 60 F.C.C.2d at 421 ("Central has long known that if it wished to displace Cowles it would have to prove, *inter alia,* that Cowles' past performance was below average.")

66. *See* pp. ——· ——, ———·——— of 194 U.S. App.D.C., pp. 53–54, 55–56 of 598 F.2d *infra.*

67. *See* pp. ·· · ····· of 194 U.S.App.D.C., pp. 56 58 of 598 F.2d *infra.*

68. *See* pp. -- of 194 U.S.App.D.C., pp. 48 –49 of 598 F.2d *supra.*

69. The Commission apparently thought the unlawful studio move relevant only to the issue of best practicable service, and having found that the move had not been shown to injure service, concluded that Cowles' distinct preference on the service issue was unimpaired, 60 F.C.C.2d at 422. It is somewhat unclear from the Commission's restatement of the overall balance in its subsequent order whether or not the violation was a demerit *per se,* 62 F.C.C.2d at 958, but it is in any case plain from its earlier discussion of the mitigating factors, *see* p. ——— of 194 U.S.App.D.C., p. 47 of 598 F.2d and note 48 *supra,* that the violation was given very little weight.

70. *Lorain Journal Co. v. FCC,* 122 U.S.App. D.C. 127, 134, 351 F.2d 824, 831 (1965), *cert. denied,* 383 U.S. 967, 86 S.Ct. 1272, 16 L.Ed.2d 308 (1966). *See also Greater Boston Television Corp. v. FCC,* 143 U.S.App.D.C. at 403, 444 F.2d at 861.

cising that discretion the Commission is free to consider mitigating factors. But the Commission is not free wholly to disregard violations of its rules. Moreover, we find neither of the "mitigating" factors relied on by the Commission in this case to be persuasive.

■ First, while a showing of harm occasioned by the violation would be relevant to the *severity* of the sanction imposed, the failure to show injury hardly excuses a plain violation. The regulation here involves a presumption that it is bad to have the main studio located—or slyly relocated—other than in the principal community. The rule would be substantially undercut if a party relying on it were forced in each case to show that the move did in fact injure the quality of service.

■ Second, we fail to see how Cowles' violation is "mitigated" by the fact that its conduct may not have been nefarious. Obviously Cowles moved its principal operations little by little; and it is well-settled that people are held to intend the obvious consequences of their acts. Further, Cowles is chargeable with knowledge of the main studio regulation. Thus, we are left with an intentional violation of a Commission rule. Of course, if Cowles had acted in bad faith, that might aggravate its violation; but the mere absence of bad faith cannot mitigate it.

On remand, the Commission should reconsider what weight to accord Cowles' plain violation of an FCC rule.

### 2. *The Mail Fraud Issue.*

■ We have two difficulties with the Commission's treatment of the PDS matter. First, it appears from the record that there were at least two persons who were principal officers both of Cowles and of each of the five PDS subsidiaries.[71] *Neither the ALJ nor the Commission made findings concerning these common officers.* In light of this uncontradicted evidence it is plain that the Commission's finding that there was no connection between Cowles and the PDS companies apart from common ownership by CCI is unsupportable. On remand the Commission will have to reconsider its findings and, if appropriate, consider the relevance of wrong-doing by a related corporation sharing principal officers with the licensee.

Second, while not unmindful of the time already occupied exploring this matter, we are troubled by appellant's contentions that the inquiry was curtailed in certain material respects. Specifically, Central argues (1) that the ALJ erroneously quashed subpoenas requiring the testimony of the postal inspectors conducting the mail fraud inquiry;[72] and (2) that it was error not to inquire into proceedings involving similar allegations being conducted by the Federal Trade Commission and various states.[73] As we are unable to decide these claims on the record before us, it will be appropriate on remand for the Commission to review the pertinent rulings by the ALJ to determine if any were prejudicial to a full and fair inquiry.

---

**71.** Marvin C. Whatmore is the Treasurer of Cowles and the President of CCI. *See Initial Decision* ' 116, J.A. at 116. The record shows that he is also the Senior Vice President and a Director of Home Reader Service, Inc., J.A. at 708; a Vice President and Treasurer of Mutual Readers League, Inc., J.A. at 744; a Vice President of Home Reference Library, Inc., J.A. at 784; a Vice President, Treasurer, and a Director of Civic Reading Club, Inc., J.A. at 820; and a Vice President and a Director of Educational Book Club, Inc., J.A. at 873.

The record shows that John F. Harding was Secretary of Cowles, and the Executive Vice President and General Counsel of CCI. *See*

*Initial Decision* ' 116, J.A. at 116. Additionally, he was a Vice President and the Secretary of Home Reader Service, Inc., J.A. at 716; a Vice President and Secretary of Mutual Readers League, Inc., J.A. at 744; a Vice President and Secretary of Home Reference Library, Inc., J.A. at 784; a Vice President, Secretary and a Director of Civic Reading Club, Inc., J.A. at 820, 823; and a Vice President, Secretary and a Director of Educational Books Club, Inc., J.A. at 873, 876.

**72.** Brief of Appellant at 22 23.

**73.** *Id.* at 20 21.

B. *Standard Comparative Issues.*

1. *Diversification.*

The effect of the Commission's reconstruction of the diversification criteria is obvious in its belittling of Central's advantage there. Because of its lack of other media interests, as contrasted with those of Cowles, Central was found by the ALJ and the Commission to have a "clear advantage" and was consequently accorded a "clear preference." However, the Commission found that the significance of the "clear preference" was reduced by several factors and that, in the end, the preference was "of little decisional significance." [74]

We fail to see how a "clear preference" on a matter which the Commission itself has called a "factor of primary significance" can fairly be of "little decisional significance." We should have thought the relevance of unconcentrated media *ownership* to the public interest inquiry was well-settled. We said—and rather plainly said—in *Citizens* that:

the Commission simply cannot make a valid public interest determination without considering the extent to which the ownership of the media will be concen-

trated or diversified by the grant of one or another of the applications before it. [75] In light of this the Commission itself has stated "whatever policy is developed [in the future] will take into account diversification as a factor that must be considered in a comparative renewal hearing." [76] Nor, as we have noted, does the Commission in this case purport to disregard the diversification factor. It merely found the applicants' clear difference uninteresting as there was no showing "that the dangers of concentration . . . exist in this case." [77]

Apart from the obvious unfairness of placing this novel burden on Central without fair notice, the question arises whether this has not seriously undercut the utility of the diversification criterion. The brief answer must be that it has.

There is *some* support for the relevance of the factors on which the Commission relied. The *1965 Policy Statement* did say that related media interests within the service area were usually *more* important than more distant interests. [78] It did not nearly say that interests outside the service area were unimportant. In fact, the fairer inference, and the one more consistent with other Commission policy, [79] is that related

---

**74.** 62 F.C.C.2d at 957.

**75.** *Citizens Communication Center v. FCC*, 145 U.S.App.D.C. at 44 n.36, 447 F.2d at 1213 n.36.

**76.** *Second Report and Order on Multiple Ownership*, 50 F.C.C.2d 1046, 1088, *amended upon reconsideration*, 53 F.C.C.2d 589 (1975), *aff'd sub nom. FCC v. National Citizens Committee for Broadcasting*, 436 U.S. 775, 98 S.Ct. 2096, 56 L.Ed.2d 697 (1978).

**77.** 62 F.C.C.2d at 957. In setting aside the Commission's disposition of the diversification issue, we have taken the Commission's assumption as our own that the matter *is* relevant to a comparative renewal inquiry. *See* 62 F.C.C.2d at 956–57; 60 F.C.C.2d at 422; note 76 *supra* ; *cf. FCC v. National Citizens Committee for Broadcasting*, 436 U.S. at 803, 98 S.Ct. at 2116. We thus confine our objections to the *manner* in which the Commission analyzed the concededly relevant factor, not intending to prescribe the weight which the Commission generally should accord media concentration in the context of comparative renewal hearings. *See FCC v. National Citizens Committee for Broadcasting*, 436 U.S. at 803, 807, 98 S.Ct. at 2116, 2118.

**78.** There the Commission said that the media interests were to be considered in light of the following schedule:

Other interests in the principal community proposed to be served will normally be of most significance, followed by other media interests in the remainder of the proposed service area and, finally, generally in the United States.

1 F.C.C.2d at 394–95 (1965).

**79.** *See Multiple Ownership of AM, FM, and Television Broadcast Stations*, 18 F.C.C. 288 (1953). These regulations limited each person to a total of seven AM radio stations, seven FM radio stations, and five VHF television stations *anywhere in the United States.* They were upheld in *United States v. Storer Broadcasting Co.*, 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081 (1956). Of course, it is strongly arguable that rule-making is preferable to *ad hoc* license renewal proceedings as an occasion for restructuring the broadcast industry, *see Report*, supra note 4, " 65, J.App. at 214–15, but so long as the Commission purports to be relying on

media interests anywhere in the nation are quite material.

More troubling still is the Commission's reliance on the autonomy which CCI accorded the local management of Cowles. This, in conjunction with the "remoteness" of CCI's other media interests, led the Commission to conclude that there had been "no adverse effect upon the flow of information to those persons in WESH·TV's service area." Further:

> We can find no evidence in the record that the dangers of concentration, which we have characterized as any national or other uniform expression of political, economic, or social opinion, exist in this case.[80]

The theory that management autonomy may satisfy the function of diversification was wholly novel when presented to this court in *Fidelity Television, Inc., v. FCC.* There we were faced with a "nothing" applicant "who offers little more and is likely in fact to provide somewhat less than the incumbent."[81] We held that the FCC had not acted unlawfully in finding that local autonomy met the objectives of diversification "sufficiently to withstand the competition of a 'nothing' competitor.[82] Whether it would have been more appropriate in *Fidelity* to concede the challenger's advantage under diversification but to conclude that that need not carry the day, is not now before us.

In any case we are reluctant to expand the relevance of local autonomy much beyond the facts of *Fidelity* for two reasons. First, the prospect of inquiry into the content of programming as would be entailed in defining "uniform expression" raises serious First Amendment questions.[83] Indeed, the Commission was sensitive to the threat of just such intrusions when it declined to employ quantitative program standards in comparative renewal hearings.[84] Second, to require a showing of the "dangers of concentration" in each case would remove the customary presumption on which the structural approach to increasing ownership diversification has rested. Given the likely difficulties of proof in such matters, widespread reliance on the autonomy excuse would effectively repeal the diversification criterion.

◼ Summarizing, we conclude that inasmuch as the Commission correctly found that Central's advantage was "clear," it was unreasonable then to accord the diversification finding "little decisional significance." On remand, it will be appropriate for the Commission to reconsider its conclusions in light of the following: (1) the conceded relevance of diversification of media ownership in the comparative renewal context; (2) the materiality of related media interests *anywhere in the nation;* and (3) the evident hazards of relying on local management autonomy as a surrogate for diversification of media ownership.

## 2. *Best Practicable Service.*

Whatever weight the Commission may have given to Central's advantages under the integration and minority participation criteria, it was not enough to "outweigh" Cowles' unexceptional record. This puzzling result appears more bizarre as it is thought about. First we note there was no direct inquiry into whether Central's proposed service would be "superior" or even just "substantial." The Commission rejected that question as too speculative, preferring to rely on those structural characteris-

diversification as a material factor in renewal hearings, it must do so in a reasonable manner. *See* p.　　　of 194 U.S.App.D.C., p. 54 of 598 F.2d *infra.*

80. 62 F.C.C.2d at 957.

81. *Fidelity Television, Inc. v. FCC,* 169 U.S. App.D.C. at 245, 515 F.2d at 704.

82. *Id.* 169 U.S.App.D.C. at 246, 515 F.2d at 705.

83. *See id.* 169 U.S.App.D.C. at 246, 257, 515 F.2d at 705, 716 (Bazelon, C. J.) (voting to grant rehearing en banc). *See also Alianza Federal de Mercedes v. FCC,* 176 U.S.App.D.C. 253, 257, 539 F.2d 732, 736 (1976).

84. *Formulation of Policies,* 66 F.C.C.2d at 426, 430.

tics identified in the 1965 statement.[85] These it supposed were less susceptible of puffery than representations concerning future programming. That is probably correct. The fly in the analysis is that the Commission judges incumbents largely on the basis of their broadcast record,[86] to which there will be nothing comparable on the side of a challenger in any case. The "comparison" thus necessarily ends up rather confused. For at the end of a hearing the Commission is left on the one hand with a series of comparative findings pertaining to integration, etc., and on the other hand with a wholly incommensurable and non-comparative finding about the incumbent's past performance. Of course the incumbent's past performance is some evidence, and perhaps the best evidence, of what its future performance would be. But findings on integration and minority participation are evidence as well, and are both *the only evidence comparing the applicants and also the only evidence whatsoever pertaining to the challenger.*

In a comparative inquiry evidence of past performance is ordinarily relevant only insofar as it predicts whether future performance will be better or worse than that of competing applicants.[87] The Commission nowhere articulated how Cowles'

unexceptional, if solid, past performance supported a finding that its future service would be better than Central's.[88] In fact, as we have noted, *Central prevailed on each of the questions supposedly predicting which applicant would better perform* —the same criteria the Commission uses for this purpose in nonrenewal comparative hearings. It is plain then that this record will not support a finding that Cowles would give the best practicable service.

In light of this we leave to conjecture what leap of faith would be required to find that Cowles prevailed in the overall inquiry. On remand, the Commission will have to reconsider its manner of deriving a preference under the best practicable service criterion, and if appropriate, how such a preference should be balanced against other factors in the more general public interest inquiry. To avoid, if possible, further appeal in this case, we address ourselves to more specific objections to the disposition of the best practicable service question.

a. *Integration*

We confess we were unable to make sense of the Commission's treatment of the integration issue, though we will reconstruct its language. The ALJ found that

**85.** *See Initial Decision* "¶ 191 92, J.A. at 133. Thus it is Commission practice not to designate an issue pertaining to the challenging applicant's proposed programming unless the challenger makes "a prima facie showing that there are significant differences" related to its "ascertainment of community needs." *Chapman Radio and Television Co.,* 7 F.C.C.2d 213, 215 (1967). As was pointed out to us in oral argument, in this case, Central did not request that its programming proposals be designated for hearing.

**86.** At the time of the Initial Decision, the renewal applicants' past broadcast record was the exclusive basis for predicting its future performance. *See Initial Decision* "¶ 191, J.A. at 133; *Wadeco, Inc.,* 41 F.C.C.2d 251 (1973). The Commission changed its position prior to its decision in this case; although still according primary weight to the renewal applicant's past record, it will also consider other comparative criteria under the 1965 statement in comparing a renewal applicant and a new applicant. *See Belo Broadcasting Corp.,* 47 F.C.C.2d 540 (1974). In light of the altered prac-

tice, the Commission made its own findings regarding Cowles' "integration proposals," 60 F.C.C.2d at 416.

**87.** Although this proposition is hardly apparent from Commission renewal practice, *see, e. g.,* 62 F.C.C.2d at 958 ("[W]e make clear that a substantial performance—i. e. sound, favorable—is entitled to legitimate renewal expectancies."), we believe that it fairly states the relevance of past performance. Admittedly this more limited relevance will remit the Commission to those 1965 comparative criteria which it finds distasteful in the renewal context. *See* note 58 *supra.* Absent statutory amendment, *see* note 59 *supra,* or promulgation of other comparative criteria, *e. g., Formulation of Policies,* 66 F.C.C.2d at 433, 438 (separate statement of Commissioners Hooks and Fogarty), we see no lawful alternative.

**88.** *Fidelity Television,* 169 U.S.App.D.C. at 230 n.3, 515 F.2d at 689 n.3. *See also* 47 C.F.R. §§ 0.281(a), 1.561, 1.562, and 1.591 (1977).

Central's integration proposals were "very weak." The Commission agreed, although it found Central's showing "somewhat stronger than that of Cowles." The Commission then noted that the ALJ's findings should be amended in light of this court's intervening *TV*-9 decision; it thus gave Central a "merit" for its proposed black participation. Pre-figuring the outcome, the Commission said that the "merit" and the "slight preference" (for integration) were insufficient to outweigh the factors in Cowles' favor under the best practicable service criterion. Oddly, four paragraphs later the Commission rethought the integration matter and decided that "neither is entitled to a preference"—not even a slight one—though Central was entitled to a "merit." [89] Odder still, this "merit" (distinct from the *TV*-9 merit) is never heard of again.[90]

More troubling is the manner by which Central's integration "preference" became a "merit." In a way wholly analogous to the diversification question, the Commission replaced the customary integration criterion (under which Cowles faired miserably, being absentee-owned by CCI) with a functional inquiry into whether management autonomy had been an adequate surrogate for owner-management.[91] Unsurprisingly, the Commission concluded that on this record it had. This permitted it to conclude "that the integration proposals of both applicants are substantially similar." [92] Mildly put, this finding is incredible if anything remains of the customary integration criterion.

■ This further repeal of the 1965 standards again derives some support from our opinion in *Fidelity*.[93] Like the reconstructed diversification analysis, the notion of functional integration was novel when presented in that case, and we have already recounted the special circumstances presented there. It may well have seemed, recalling the court's characterization of Fidelity as a "nothing" applicant, that the modifications of the 1965 criteria left the substance of the comparative hearing unimpaired. On the facts of this case, the same cannot be said. The Commission's treatment of the integration criterion, in light of its treatment of diversification and Cowles' past performance, has denied Central the substance of its right to a full hearing, and is *ipso facto* unreasonable. The Commission may not, comfortably with the hearing mandate of § 309(e), practically abandon the 1965 criteria without providing an alternate scheme affording a thorough and intelligible comparison. On remand, the Commission will have occasion to reconsider its findings on the integration issue.

### b. *Cowles' Past Performance*

■ For anyone who remained hopeful that Central's now-shrunken advantages would carry the day, the treatment of Cowles' past performance was plainly the *coup de grace*. The Commission recharacterized as "superior" the record which the ALJ had found "thoroughly acceptable." Evidently, the Commission felt that a recitation of the idiom in *Citizens* would permit it to recognize Cowles' "renewal expectancy." If that were correct, we might be more inclined to resist the Commission's characterization.[94] However, a finding of

89. 60 F.C.C.2d at 416.

90. Leading the cynical to suggest that the only difference between a "preference" and a "merit" is that the latter may be misplaced without embarrassment.

91. 60 F.C.C.2d at 415, 416. In finding this ersatz integration enhanced by local management's civic interests, the Commission seems to be running headlong into itself, *see Lorain Community Broadcasting Co.*, 13 F.C.C.2d 106, 109–10 (Rev.Bd.1968); *Report, supra* note 4, ¶ 25, J.A. at 189, although to be sure it has

done so before with this court's pardon. *See Fidelity Television, Inc. v. FCC,* 169 U.S.App. D.C. at 242, 515 F.2d at 701.

92. 60 F.C.C.2d at 416.

93. *Fidelity Television, Inc. v. FCC,* 169 U.S. App.D.C. at 241–42, 515 F.2d at 700–01.

94. Chairman Wiley was similarly skeptical about the "superiority" of Cowles' performance. Dissenting from the Commission's first order, 60 F.C.C.2d at 430, the Chairman concluded that Cowles' "thoroughly acceptable"

"superior" service is not an end to the inquiry; it is rather, as we stated in *Citizens,* a "plus of major significance" to be factored into the comparative analysis. In its reconsideration, the Commission resisted general use of the word "superior" preferring the word "substantial" to describe records such as Cowles'. This the Commission felt would not "convey the impression that . . . past programming was exceptional when compared to other broadcast stations in service area or elsewhere." [95] If by this the Commission means either (1) that "substantial" service will justify renewal *more or less* without regard to comparative issues; [96] or (2) that "substantial" performance which is not above the average is entitled to "a plus of major significance," [97]

it is plainly mistaken. We emphasize that lawful renewal expectancies are confined to the likelihood that an incumbent will prevail in a fully comparative inquiry. "Superior" or above average past performance is, of course, highly relevant to the comparison, and might be expected to prevail absent some clear and strong showing by the challenger under the comparative factors (either affirmative bearing on the challenger's projected program performance, or negative regarding the incumbent's media ties or perhaps discovered character deficiencies) or other designated issues.[98] But we do not see how performance that is merely average, whether "solid" or not, can warrant renewal or, in fact, be of especial relevance without some finding that the

---

performance was "insufficient to offset [its] disadvantage under the other comparative criteria." *Id.* at 431. Then in light of the Commission's subsequent opinion, Chairman Wiley concurred in the renewal, predicated now on a more modest characterization of Cowles' performance:

> In its original opinion, the majority adopted the requirement of "superior *s*ervice" as set forth in dictum in *Citizens Communication Center v. FCC.* I dissented to this determination on the grounds that WESH-TV's service, while "thoroughly adequate" so as to justify renewal under any rational renewal system, was simply not "superior." On reconsideration, the majority now articulates the required standard of service as "solid and favorable" (as opposed to superior in terms of exceptional or of the highest possible level).
>
> As indicated, *I did not—and do not now— find Cowles' service to be superior (in the sense of exceptional).* However, I did—and do now—find that service to be sufficiently substantial (in the sense of solid and favorable) to warrant renewal. Accordingly, given the majority's clarification of intent, I find myself able to concur in this matter.

62 F.C.C.2d at 958–59 (emphasis added). Although the Commission majority in its clarification, did not expressly find that Cowles' performance was *not* superior, it did decline to find that it was superior in the sense of being exceptional. 62 F.C.C.2d at 956. It being conceded that Cowles' record was not exceptional, we have no quarrel with the Commission's assessment, which is amply supported. *See* 60 F.C.C.2d at 421.

**95.** 62 F.C.C.2d at 956.

**96.** This inference is inescapable in light of the Commission's numerous statements in this case, *e. g.,* 60 F.C.C.2d at 421–22; 62 F.C.C.2d

at 956, 958; and elsewhere. *E. g., Formulation of Policies,* 66 F.C.C.2d at 430.

The Commission is not unwitting of its error. It has recently recalled (not in a renewal proceeding to be sure) that this court has proscribed just such noncomparative renewal decisions. *See Report, supra* note 4, ⸴ 79, J.A. at 222.

**97.** As the Commission finds substantial service, without more, to be dispositive, it has no occasion to make the somewhat less erroneous determination merely to accord its finding excessive weight. We have previously described the quality of performance entitled to "a plus of major significance:"

> We used the word "superior" in its ordinary dictionary meaning: "far above the average." Webster's New World Dictionary 1463 (college ed. 1968). And we suggested specific criteria for use in determining whether an incumbent had performed in a "superior" manner, including (1) elimination of excessive and loud advertising; (2) delivery of quality programs; (3) the extent to which the incumbent has reinvested the profit from his license to the service of the viewing and listening public; (4) diversification of ownership of mass media; and (5) independence from governmental influence in promoting First Amendment objectives.

*Citizens Communication Center v. FCC,* 149 U.S.App.D.C. 419, 420, 463 F.2d 822, 823 (1972), *clarifying Citizens Communication Center,* 145 U.S.App.D.C. 32, 447 F.2d 1201 (1971). Because the Commission did not purport to find Cowles' performance superior, *see* note 90 *supra,* we have no occasion to review its conformance with our second *Citizens* opinion.

**98.** *See Citizens Communication Center v. FCC,* 145 U.S.App.D.C. at 44, 447 F.2d at 1213.

challenger's performance would likely be no more satisfactory.[99]

On remand, the Commission will have occasion to reconsider its characterization of Cowles' past performance and to articulate clearly the manner in which its findings are integrated into the comparative analysis.

## IV. CONCLUSION

We remand this case in light of our abiding conviction that the Commission's order is unsupported by the record and the prior law on which it purported to rely. We are especially troubled by the possibility that settled principles of administrative practice may be ignored because of the Commission's insecurity or unhappiness with the substance of the regulatory regime it is charged to enforce. Nothing would be more demoralizing or unsettling of expectations than for drifting administrative adjudications quietly to erode the statutory mandate of the Commission and judicial precedent.

*Orders vacated and case remanded for proceedings consistent with this opinion.*

## On Petition for Rehearing

### PER CURIAM.

■ The FCC and intervenors in this matter seek a rehearing, complaining *inter alia* that our opinion disregards the "legitimate renewal expectancies implicit in the structure of the [Communications] Act." [1] In light of the ambiguity of the phrase "renewal expectancies" and the frequency

with which they are asserted to insulate an incumbent from license challenge, we think some clarification is called for, both generally and insofar as such an expectation may have been undercut in this case.

The content of the comparative proceeding at issue was governed by the Commission's 1965 Policy Statement; [2] however, the weight to be given findings under the various criteria was, as in all *renewal* proceedings, dependent upon the particular facts of the case.[3] The Commission renewed the incumbent's license after a hearing. It summarized as follows its rationale for doing so:

Our conclusions in this regard do not mean—or suggest—that a challenger is denied an opportunity to show that a grant of his application will better serve the public interest. They do mean that a challenger is in a less favorable position, however, because he asks the Commission to speculate whether his untested proposal is *likely* to be superior to that of an incumbent. The Commission—and the Court—have consistently recognized that a record of past programming performance is the very best indication of future performance. It is for this reason that we make clear that a substantial performance—i. e. sound, favorable—is entitled to legitimate renewal expectancies. Under the circumstances here, this consideration is decisive. Central's preference under the diversification criterion is of little decisional significance and Central is entitled to no preference under the integration criterion. These factors, even considering Cowles' slight demerit for the

---

**99.** This case does not raise the question whether, between equally qualified applicants, the renewal applicant lawfully may be preferred on the basis of a renewal expectancy. *E. g., Fidelity Television, Inc. v. FCC,* 169 U.S.App.D.C. at 243, 515 F.2d at 702. We contemplate that such instances of equipoise will be exceedingly rare if the Commission seriously undertakes a full comparison.

**1.** FCC Petition for Rehearing at 9 (citing *Greater Boston,* 143 U.S.App.D.C. at 396, 444 F.2d at 854).

**2.** *1965 Policy Statement on Comparative Broadcast Hearings,* 1 F.C.C.2d 393 (1965).

**3.** *See Central Florida Enterprises, Inc.,* 194 U.S.App.D.C. at ·, 598 F.2d 37 at 42 (1978); *Seven (7) League Productions, Inc.,* 1 F.C.C.2d 1597, 1598 (1965); *see' also Belo Broadcasting Corp.,* 47 F.C.C.2d 540, 543–44 (1974).

studio move and Central's merit for the Black ownership it proposes definitely do not outweigh the substantial service Cowles rendered to the public during the last license period.[4]

We set aside the renewal. Our principal reason for doing so was that the Commission's manner of "balancing" its findings was wholly unintelligible,[5] based, it was said, on "administrative 'feel.'"[6] Admittedly, licensing in the public interest entails a good many discretionary choices, but even if some of them rest inescapably on agency intuition (not a comfortable idea),[7] we may at least insist that they do not contradict whatever rules for choosing do exist. We think it plain that the Commission violated the rules. In our opinion we observed:

the Commission purported to be conducting a full hearing whose content is governed by the 1965 *Policy Statement*. It found favorably to Central on each of diversification, integration, and minority participation, and adversely to Cowles on the studio move question. Then simply on the basis of a wholly noncomparative assessment of Cowles' past performance as "substantial," the Commission confirmed Cowles' "renewal expectancy."[8]

The dispositive question is, of course, the relevance of the incumbent's past performance. We thought it relevant "only insofar as it predicts whether future performance will be better or worse than that of competing applicants."[9] From much of the Commission's language (apart from its holding), it appeared to agree.[10] We understand, of course, that it does not.[11] If we were correct, the Commission's decision cannot stand, for as we noted:

Of course the incumbent's past performance is some evidence, and perhaps the best evidence, of what its future performance would be. But findings on integration and minority participation are evidence as well, and are both *the only evidence comparing the applicants and also the only evidence whatsoever pertaining to the challenger.*

. . . The Commission nowhere articulated how Cowles' unexceptional, if solid, past performance supported a finding that its future service would be better than Central's. In fact, as we have noted, *Central prevailed on each of the questions supposedly predicting which applicant would better perform* —the same criteria the Commission uses for this purpose in non-renewal comparative hearings. It is plain then that this record will

---

**4.** 62 F.C.C.2d at 958 (emphasis original).

**5.** 194 U.S.App.D.C. at ——, 598 F.2d at 50.

**6.** 60 F.C.C.2d at 422.

**7.** As Judge Leventhal said, dissenting to an affirmance of an FCC comparative hearing award in *Star Television, Inc. v. FCC*, 135 U.S. App.D.C. 71, 79, 80, 416 F.2d 1086, 1089, 1094–95, *cert. denied,* 396 U.S. 888, 90 S.Ct. 171, 24 L.Ed.2d 163 (1969):

I frankly put to myself this question, Should the courts continue to adhere to the approach of requiring the agency to develop a meaningful statement of reasons for a function like this, of choosing the best qualified among several competing applicants? Maybe an agency cannot meaningfully say more than why it screens out those applicants who fall by the wayside due to 'demerits' in some prominent category, or who are plainly second best for some reason. Maybe all it can do as to the other applicants is say: These applicants are all reasonably qualified; we have no meaningful way of choosing on

principle between them; all we can really do is speculate who will do the best job in the public interest; and our best possible hunch is X. I believe Justice Frankfurter has applied to the concept of administrative expertise the phrase of Justice Holmes concerning intuition that outruns analysis. The possibility that an agency may come to the point of resting on intuition is all the greater when it is recalled that there are no doctrines of burden of proof such as are available for decision of court cases when the proof stands in equipoise.

**8.** 194 U.S.App.D.C. at ——, 598 F.2d at 49.

**9.** 194 U.S.App.D.C. at ——, 598 F.2d at 55.

**10.** *See, e. g.,* 62 F.C.C.2d at 958 ("[A] challenger is in a less favorable position, however, because he asks the Commission to speculate whether his untested proposal is *likely* to be superior to that of an incumbent.") (emphasis original).

**11.** *See* FCC Petition for Rehearing at 7.

not support a finding that Cowles would give the best practical service.[12]

However, there is the possibility that an incumbent's meritorious record had literally untold significance. *If it were given enough weight* (entirely apart from predicting the future), as, for example, to assure industry stability, *the incumbent could conceivably prevail even were the challenger otherwise thought the better applicant.* There are probably many policies, more or less inferable from the "public interest", which might be balanced together with the predicted quality of programming.[13] We understand the Commission, in pressing renewal expectancies, to be concerned with the disincentive effects of uncertainty. It argues in its petition for rehearing:

> Moreover, under the panel's ruling, substantially-performing incumbents are deprived of the "renewal expectancies" which this Court in *Greater Boston* viewed as "ordinary", "legitimate", and "implicit in the structure of the Act." As the Court there explained, "such expectancies are provided in order to promote security of tenure and to induce efforts and investments, furthering the public interest, that may not be devoted by a licensee without reasonable security." Pursuant to these expectancies a "substantial" or "meritorious" past record is a

relevant factor to be weighed in the incumbent's favor. In this sense, a "meritorious" past record deserves appropriate weight in the overall "public interest" determination, irrespective of the predictive value of past performance and, contrary to the panel's view (194 U.S. App.D.C. at ——, 598 F.2d at 57), irrespective of any finding concerning the cerning the challenger's likely future per-

This, we admit, appears at least a plausible construction of the "public interest."

The trouble is, apart from several unenlightening recitals that there are expectations implicit in the Act, *there were few intimations that this was the Commission's inchoate rationale.*[15] Of course, even had we guessed, we could not have sustained the Commission by further speculating about the weight constructively given the incumbent's past performance.[16] Nor may we review a rationale presented for the first time in this court.[17] *The place for a new rationale in this case, if one is to be logically developed, is on remand.* Moreover, if through rule-making or adjudication the Commission decides to accord weight to such non-comparative values as industry stability, it will have to do so in a manner that is susceptible of judicial review.[18] This would seem to require that the

**12.** 194 U.S.App.D.C. at   ,   , 598 F.2d at 55 (emphasis original).

**13.** Diffusion of media ownership is in some sense such a policy.

**14.** FCC Petition for Rehearing at 7 (footnotes omitted).

**15.** *See, e. g.,* 60 F.C.C.2d at 422; 62 F.C.C.2d at 958. The FCC also suggests in its Petition for Rehearing, at 6, that our opinion precludes it from taking account of the natural "credibility" of even an "average incumbent's" proposals derived from the "common sense logic that substantial past performance is the most dependable indicator of substantial future performance." This is incorrect. We said "we do not see how performance that is merely average, whether 'solid' or not, can warrant renewal or, in fact, be of especial relevance without some finding that the challenger's performance would likely be no more satisfactory." 194 U.S.App.D.C. at   , 598 F.2d at 57. We plainly contemplated that the Commission

would consider the likelihood of applicants effecting their proposals, as would be only sensible.

**16.** Thus, conclusory references to the need for industry stability are hardly a substitute for the statutorily mandated and particularized balancing.

**17.** *See SEC v. Chenery Corp.,* 318 U.S. 80, 87 89, 63 S.Ct. 454, 87 L.Ed. 626 (1943), *United States Lines, Inc. v. Federal Maritime Commission,* 189 U.S.App.D.C. 361 at 376 & n.43, 584 F.2d 519 at 534 & n.43 (1978).

**18.** We recall that the Commission's license to define the public interest, although broad, is not unbounded. *See NAACP v. FPC,* 425 U.S. 662, 669, 96 S.Ct. 1806, 1811, 48 L.Ed.2d 284 (1976) ("the use of the words 'public interest' in a regulatory statute is not a broad license to promote the general public welfare," instead these words "take meaning from the purposes

Commission describe with at least rough clarity how it takes into account past performance, and how that factor is balanced alongside its findings under the comparative criteria. Although mathematical precision is, of course, impossible, something more than the Commission's customary recitals, "completely opaque to judicial review," must be provided. The choice of procedures through which an intelligible analysis could be composed is, as we have said, for the Commission.

Since the FCC petition for rehearing displayed a certain agitated concern that our decision in this case would destroy legitimate renewal expectancies of licensees, with baleful commercial consequences and harm to the general public, we thought it relevant to inquire of the Commission as to just how strong those renewal expectancies have been in the past, based on the action actually taken by the Commission and reviewing court.

The history of comparative renewal proceedings since 1 January 1961 (the date from which the data was requested) discloses that incumbents rarely have lost, and then only because they were disqualified on some noncomparative ground. From 1961 to 1978 the Commission has conducted seventeen comparative television license renewal proceedings, seven of which are still pending.[19] In only two cases did the incumbent lose its license,[20] and in *neither* of those cases were the comparative criteria the grounds of decision. In one case the incumbent was disqualified because of its fraudulent conduct,[21] and in the other the incumbent failed to pursue its renewal application, so the challenger won by default.[22]

The story is not much different in radio licensing. No license has been denied on a comparative basis.[23]

Plainly, incumbents can "expect" in a statistical sense that their license will be renewed. We doubt that any realistic appraisal of the remand in this single case, calling upon the Commission to perform its duty in accord with its own expressed standards, could reasonably create the nervous apprehension among licensees claimed by the Commission. The only legitimate fear

of the regulatory legislation"). Apart from the obvious limitations imposed by its subject matter jurisdiction, *see National Organization for Women v. FCC*, 181 U.S.App.D.C. 65, 80, 555 F.2d 1002, 1017 (1977), there may be subtler constraints "implicit in the structure of the Act." The Communications Act is very clear that "no . . license shall be construed to create any right, beyond the terms, conditions, and periods of the license." 47 U.S.C. § 301 (1976). The Act's disfavor of vested license rights reflects the need, which has long informed the public interest standard as well, for "diverse and antagonistic sources of information." *Citizens Communications Center v. FCC*, 145 U.S.App.D.C. 32, 44 n.36, 447 F.2d 1201, 1213 n.36 (1971). The point at which a renewal expectation would become an impermissible vested property right is a worrisome question about which we intimate no view.

**19.** Letter of Daniel M. Armstrong, Associate General Counsel, Federal Communications Commission, to George A. Fisher, Clerk, United States Court of Appeals, District of Columbia Circuit, 11 December 1978.

**20.** This does not include the much-publicized case of WHDH–TV, Boston, Massachusetts, which was treated as though it were a comparative proceeding between "new" applicants. *See Greater Boston Television Corp. v. FCC*, 143 U.S.App.D.C. 383, 444 F.2d 841 (1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971).

**21.** *Western Communications, Inc. (KORK–TV), Las Vegas, Nevada*, 59 F.C.C.2d 1441 (1976), *reconsideration denied*, 61 F.C.C.2d 974, *aff'd in part and rev'd and remanded in part sub nom., Las Vegas Broadcasting Co. v. FCC*, Nos. 76–2104 and 76–2124 (D.C.Cir., 26 October 1978) 191 U.S.App.D.C. 71, 589 F.2d 594 (affirming the denial of renewal but reversing the disqualification of the challenger).

**22.** *Gerico Investment Co.*, 31 F.C.C. 625 (1961).

**23.** From 1961 to 1978 there were thirty-one comparative radio renewal proceedings, twelve of which are still pending. No incumbent radio licensee has been displaced on the basis of the comparative criteria Three licensees were disqualified for misconduct, five other renewal applications were dismissed, and the challengers' applications granted. See letters of Daniel M. Armstrong, Associate General Counsel, Federal Communications Commission, to George A. Fisher, Clerk, United States Court of Appeals, District of Columbia Circuit, 11 and 13 December 1978.

which should move licensees is the fear of their own substandard performance, and that would be all to the public good.