683 F.2d 503
 221 U.S.App.D.C. 162
 CENTRAL FLORIDA ENTERPRISES, INC., Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
Cowles Broadcasting, Inc. and Cowles Communications, Inc.,
Intervenors.
NATIONAL BLACK MEDIA COALITION, et al., Appellants,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
Cowles Broadcasting, Inc., Cowles Communications, Inc., and
Central Florida Enterprises, Inc., Intervenors.
 Nos. 81-1795, 81-1796.
 United States Court of Appeals,
District of Columbia Circuit.
 
 Argued 28 April 1982.
Decided 13 July 1982.
 Appeal from an Order of the Federal Communications Commission.
 Joseph F. Hennessey, Washington, D. C., with whom Mary C. Albert and Lee G. Lovett, Washington, D. C., were on the brief for Central Florida Enterprises, Inc., appellant in No. 81-1795 and intervenor in No. 81-1796.
 Jeffrey H. Olson, Washington, D. C., for appellants, National Black Media Coalition, et al., in No. 81-1796.
 Daniel M. Armstrong, Associate Gen. Counsel, F. C. C., Washington, D. C., with whom Stephen A. Sharp, Gen. Counsel, David Silberman, Counsel, F. C. C., Washington, D. C., were on the brief, for appellee.
 Robert A. Marmet, Washington, D. C., with whom Harold K. McCombs, Jr., Washington, D. C., was on the brief, for intervenors, Cowles Broadcasting, Inc., et al., in Nos. 81-1795 and 81-1796.
 Henry Geller, Washington, D. C., was on the brief for amicus curiae, Henry Geller, urging reversal.
 Earle K. Moore and Donna A. Demac, New York City, were on the brief, for amicus curiae, Office of Communications of the United Church of Christ, urging reversal of the FCC decision denying standing to intervene to the National Black Media Coalition.
 Before ROBINSON, Chief Judge, WILKEY, Circuit Judge, and FLANNERY,* District Judge for the District of Columbia.
 Opinion for the Court filed by Circuit Judge WILKEY.
 WILKEY, Circuit Judge:
 
 
 1
 This case involves a license renewal proceeding for a television station. The appeal before us is taken from a new decision[1] by the Federal Communications Commission ("FCC" or "the Commission") after our opinion in Central Florida Enterprises v. FCC (Central Florida I)[2] vacated the Commission's earlier orders involving the present parties. The FCC had granted the renewal of incumbent's license, but we held that the Commission's fact-finding and analysis on certain issues before it were inadequate, and that its method of balancing the factors for and against renewal was faulty. On remand, while the FCC has again concluded that the license should be renewed, it has also assuaged our concerns that its analysis was too cursory and has adopted a new policy for comparative renewal proceedings which meets the criteria we set out in Central Florida I. Accordingly, and with certain caveats, we affirm the Commission's decision.[3]
 
 
 2
 The factual background and legal issues involved in this case were discussed at length in our earlier opinion and can be summarized briefly here. Central Florida Enterprises has challenged the FCC's decision to renew Cowles Broadcasting's license to operate on Channel 2 in Daytona Beach, Florida. In reaching a renewal/nonrenewal decision, the FCC must engage in a comparative weighing of pro-renewal considerations against anti-renewal considerations. In the case here, there were four considerations potentially cutting against Cowles: its illegal move of its main studio, the involvement of several related companies in mail fraud, its ownership of other communications media, and its relative (to Central Florida) lack of management-ownership integration. On the other hand, Cowles' past performance record was "superior," i.e., "sound, favorable and substantially above a level of mediocre service which might just minimally warrant renewal."[4]
 
 
 3
 In its decision appealed in Central Florida I the FCC concluded that the reasons undercutting Cowles' bid for renewal did "not outweigh the substantial service Cowles rendered to the public during the last license period."[5] Accordingly, the license was renewed. Our reversal was rooted in a twofold finding. First, the Commission had inadequately investigated and analyzed the four factors weighing against Cowles' renewal. Second, the process by which the FCC weighed these four factors against Cowles' past record was never "even vaguely described"[6] and, indeed, "the Commission's handling of the facts of this case (made) embarrassingly clear that the FCC (had) practically erected a presumption of renewal that is inconsistent with the full hearing requirement"[7] of the Communications Act.[8] We remand with instructions to the FCC to cure these deficiencies.
 
 
 4
 On remand the Commission has followed our directives and corrected, point by point, the inadequate investigation and analysis of the four factors cutting against Cowles' requested renewal. The Commission concluded that, indeed, three of the four merited an advantage for Central Florida, and on only one (the mail fraud issue) did it conclude that nothing needed to be added on the scale to Central's plan or removed from Cowles'. We cannot fault the Commission's actions here.[9]
 
 
 5
 We are left, then, with evaluating the way in which the FCC weighed Cowles' main studio move violation and Central's superior diversification and integration, on the one hand, against Cowles' substantial record of performance on the other. This is the most difficult and important issue in this case, for the new weighing process which the FCC has adopted will presumably be employed in its renewal proceedings elsewhere. We therefore feel that it is necessary to scrutinize carefully the FCC's new approach, and discuss what we understand and expect it to entail.[10]
 
 
 6
 For some time now the FCC has had to wrestle with the problem of how it can factor in some degree of "renewal expectancy" for a broadcaster's meritorious past record, while at the same time undertaking the required[11] comparative evaluation of the incumbent's probable future performance versus the challenger's. As we stated in Central Florida I, "the incumbent's past performance is some evidence, and perhaps the best evidence, of what its future performance would be."[12] And it has been intimated-by the Supreme Court in FCC v. National Citizens Committee for Broadcasting (NCCB)[13] and by this court in Citizens Communications Center v. FCC[14] and Central Florida I[15]-that some degree of renewal expectancy is permissible. But Citizens and Central Florida I also indicated that the FCC has in the past impermissibly raised renewal expectancy to an irrebuttable presumption in favor of the incumbent.
 
 
 7
 We believe that the formulation by the FCC in its latest decision, however, is a permissible way to incorporate some renewal expectancy while still undertaking the required comparative hearing. The new policy, as we understand it, is simply this: renewal expectancy is to be a factor weighed with all the other factors, and the better the past record, the greater the renewal expectancy "weight."
 
 
 8
 In our view (states the FCC), the strength of the expectancy depends on the merit of the past record. Where, as in this case, the incumbent rendered substantial but not superior service, the "expectancy" takes the form of a comparative preference weighed against (the) other factors .... An incumbent performing in a superior manner would receive an even stronger preference. An incumbent rendering minimal service would receive no preference.[16]
 
 
 9
 This is to be contrasted with Commission's 1965 Policy Statement on Comparative Broadcast Hearings,[17] where "(o)nly unusually good or unusually poor records have relevance."[18]
 
 
 10
 If a stricter standard is desired by Congress, it must enact it. We cannot: the new standard is within the statute.
 
 
 11
 The reasons given by the Commission for factoring in some degree of renewal expectancy are rooted in a concern that failure to do so would hurt broadcast consumers.
 
 
 12
 The justification for a renewal expectancy is three-fold. (1) There is no guarantee that a challenger's paper proposals will, in fact, match the incumbent's proven performance. Thus, not only might replacing an incumbent be entirely gratuitous, but it might even deprive the community of an acceptable service and replace it with an inferior one. (2) Licensees should be encouraged through the likelihood of renewal to make investments to ensure quality service. Comparative renewal proceedings cannot function as a "competitive spur" to licensees if their dedication to the community is not rewarded. (3) Comparing incumbents and challengers as if they were both new applicants could lead to a haphazard restructuring of the broadcast industry especially considering the large number of group owners. We cannot readily conclude that such a restructuring could serve the public interest.[19]
 
 
 13
 We are relying, then, on the FCC's commitment that renewal expectancy will be factored in for the benefit of the public, not for incumbent broadcasters.[20] In subsequent cases we must judge the faithfulness of the FCC to that commitment, for, as the Supreme Court has said, "It is the right of the viewers and listeners, not the right of the broadcasters, which is paramount,"[21] citing its earlier statement that "(p)lainly it is not the purpose of the (Communications) Act to protect a license against competition but to protect the public."[22] Then Circuit Judge Burger, as a member of this court, wrote:
 
 
 14
 A broadcaster seeks and is granted the free and exclusive use of a limited and valuable part of the public domain; when he accepts that franchise it is burdened with enforceable public obligations .... After nearly five decades of operation the broadcast industry does not seem to have grasped the simple fact that a broadcast license is a public trust subject to termination for breach of duty.[23]
 
 
 15
 As we concluded in Central Florida I, "(t)he only legitimate fear which should move (incumbent) licensees is the fear of their own substandard performance, and that would be all to the public good."[24]
 
 
 16
 There is a danger, of course, that the FCC's new approach could still degenerate into precisely the sort of irrebuttable presumption in favor of renewal that we have warned against. But this did not happen in the case before us today, and our reading of the Commission's decision gives us hope that if the FCC applies the standard in the same way in future cases, it will not happen in them either. The standard is new, however, and much will depend on how the Commission applies it and fleshes it out. Of particular importance will be the definition and level of service it assigns to "substantial"-and whether that definition is ever found to be "opaque to judicial review,"[25] "wholly unintelligible,"[26] or based purely on "administrative 'feel.' "[27]
 
 
 17
 In this case, however, the Commission was painstaking and explicit in its balancing. The Commission discussed in quite specific terms, for instance, the items it found impressive in Cowles' past record. It stressed and listed numerous programs demonstrating Cowles' "local community orientation" and "responsive(ness) to community needs," discussed the percentage of Cowles' programming devoted to news, public affairs, and local topics, and said it was "impressed by (Cowles') reputation in the community. Seven community leaders and three public officials testified that (Cowles) had made outstanding contributions to the local community. Moreover, the record shows no complaints ...." The Commission concluded that "Cowles' record (was) more than minimal," was in fact " 'substantial,' i.e., 'sound, favorable and substantially above a level of mediocre service which might just minimally warrant renewal.' "[28]
 
 
 18
 The Commission's inquiry in this case did not end with Cowles' record, but continued with a particularized analysis of what factors weighed against Cowles' record, and how much. The FCC investigated fully the mail fraud issue.[29] It discussed the integration and diversification disadvantages of Cowles and conceded that Central had an edge on these issues-"slight" for integration, "clear" for diversification.[30] But it reasoned that "structural factors such as (these)-of primary importance in a new license proceeding-should have lesser weight compared with the preference arising from substantial past service."[31] Finally, with respect to the illegal main studio move, the FCC found that "licensee misconduct" in general "may provide a more meaningful basis for preferring an untested challenger over a proven incumbent."[32] The Commission found, however, that here the "comparative significance of the violation" was diminished by the underlying facts:
 
 
 19
 Cowles did not actually move a studio away from Daytona Beach. It maintained two studios, one of which gradually became somewhat superior to the other. Thus, while a violation of the rule technically occurred, Cowles demonstrated no tendency to flout Commission rules or disserve the community of license.[33]
 
 
 20
 The FCC concluded that "the risk to the public interest posed by the violation seems small when compared to the actuality of depriving Daytona Beach of Cowles' tested and acceptable performance."[34]
 
 
 21
 Having listed the relevant factors and assigned them weights, the Commission concluded that Cowles' license should be renewed. We note, however, that despite the finding that Cowles' performance was " 'substantial,' i.e., 'sound, favorable and substantially above a level of mediocre service,' "[35] the combination of Cowles' main studio rule violation and Central's diversification and integration advantages made this a "close and difficult case."[36] Again, we trust that this is more evidence that the Commission's weighing did not, and will not, amount to automatic renewal for incumbents.
 
 
 22
 We are somewhat reassured by a recent FCC decision granting, for the first time since at least 1961,[37] on comparative grounds the application of the challenger for a radio station license and denying the renewal application of the incumbent licensee.[38] In that decision the Commission found that the incumbent deserved no renewal expectancy for his past program record and that his application was inferior to the challenger's on comparative grounds. Indeed, it was the incumbent's preferences on the diversification and integration factors which were overcome (there, by the challenger's superior programming proposals and longer broadcast week). The Commission found that the incumbent's "inadequate (past performance) reflects poorly on the likelihood of future service in the public interest." Further, it found that the incumbent had no "legitimate renewal expectancy" because his past performance was neither "meritorious" nor "substantial."[39]
 
 
 23
 We have, however, an important caveat. In the Commission's weighing of factors the scale mid-mark must be neither the factors themselves, nor the interests of the broadcasting industry, nor some other secondary and artificial construct, but rather the intent of Congress, which is to say the interests of the listening public. All other doctrine is merely a means to this end, and it should not become more. If in a given case, for instance, the factual situation is such that the denial of a license renewal would not undermine renewal expectancy in a way harmful to the public interest, then renewal expectancy should not be invoked.[40]
 
 
 24
 Finally, we must note that we are still troubled by the fact that the record remains that an incumbent television licensee has never been denied renewal in a comparative challenge.[41] American television viewers will be reassured, although a trifle baffled, to learn that even the worst television stations-those which are, presumably, the ones picked out as vulnerable to a challenge[42]-are so good that they never need replacing. We suspect that somewhere, sometime, somehow, some television licensee should fail in a comparative renewal challenge, but the FCC has never discovered such a licensee yet. As a court we cannot say that it must be Cowles here.
 
 
 25
 We hope that the standard now embraced by the FCC will result in the protection of the public, not just incumbent licensees. And in today's case we believe the FCC's application of the new standard was not inconsistent with the Commission's mandate. Accordingly the Commission's decision is
 
 
 26
 Affirmed.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 292(a) (1976)
 
 
 [1]
 Cowles Broadcasting, Inc., 86 F.C.C.2d 993 (1981). The proceedings prior to this new decision are at 60 F.C.C.2d 372 (1976), reconsideration denied and clarified, 62 F.C.C.2d 953 (1977), reconsideration denied, 40 Rad.Reg.2d 1627 (1977), vacated and remanded sub nom. Central Fla. Enters. v. FCC, 598 F.2d 37 (D.C.Cir.1978), cert. dismissed, 441 U.S. 957, 99 S.Ct. 2189, 60 L.Ed.2d 1062 (1979)
 
 
 [2]
 598 F.2d 37 (D.C.Cir.1978), cert. dismissed, 441 U.S. 957, 99 S.Ct. 2198, 60 L.Ed.2d 1062 (1979)
 
 
 [3]
 National Black Media Coalition (NMBC), et al., challenge the Commission's denial of their petition to intervene. (The Commission instead accepted and considered NMBC's pleadings as amicus briefs.) However, we need not resolve the issue of NMBC's standing since it raises no issues not raised by Central that would affect the disposition of the appeal, making irrelevant whether we view their submissions as those of parties or of amici
 
 
 [4]
 62 F.C.C.2d at 955
 
 
 [5]
 Id. at 958
 
 
 [6]
 598 F.2d at 50
 
 
 [7]
 Id. at 51
 
 
 [8]
 47 U.S.C. § 309(e) (1976)
 
 
 [9]
 See pp. 508-509 for a discussion of the Commission's factfinding on these issues
 
 
 [10]
 As we said in Central Florida I, "This may well be a typical comparative renewal case, hence the careful scrutiny we give the Commission's procedure and rationale herein." 598 F.2d at 40
 
 
 [11]
 See Ashbacker Radio Corp. v. FCC, 326 U.S. 327, 333, 66 S.Ct. 148, 151, 90 L.Ed. 108 (1945); Central Florida I, 598 F.2d at 41-42; Greater Boston Television Corp. v. FCC, 444 F.2d 841, 851 (D.C.Cir.1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971); Citizens Communications Center v. FCC, 447 F.2d 1201, 1211 (D.C.Cir.1971), clarification granted, 463 F.2d 822 (1972)
 
 
 [12]
 598 F.2d at 55. See also FCC v. Nat'l Citizens Comm. for Broadcasting, 436 U.S. 775, 806, 98 S.Ct. 2096, 2117, 56 L.Ed.2d 697 (1978); Citizens, 447 F.2d at 1208
 
 
 [13]
 436 U.S. 775, 782, 782-83 n.5, 805-07, 98 S.Ct. 2096, 2105, 2106 n.5, 2117-18, 56 L.Ed.2d 697 (1978)
 
 
 [14]
 447 F.2d 1201, 1213 and n.35 (D.C.Cir.1971), clarification granted, 463 F.2d 822 (1972)
 
 
 [15]
 598 F.2d at 60. See also Greater Boston Television Corp. v. FCC, 444 F.2d 841, 854 (D.C.Cir.1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971); Fidelity Television, Inc. v. FCC, 515 F.2d 684, 702 (D.C.Cir.), cert. denied, 423 U.S. 926, 96 S.Ct. 271, 46 L.Ed.2d 253 (1975)
 
 
 [16]
 86 F.C.C.2d at 1012. The continuum approach adopted seems foreshadowed by Citizens. 447 F.2d at 1213
 We note that there is some confusion between the Commission's pleadings and the Commission's decision as to whether the main studio move violation was weighed against the renewal expectancy, or diminished the renewal expectancy to begin with. Compare, e.g., Brief for the FCC at 8, 14-15, 27 with 86 F.C.C.2d at 1012-13, 1015-18. An analysis of this hypertechnical issue would be relevant only were we to concede that it matters when the various factors are weighed, but this sort of timing should not, must not, be critical. See also note 31 infra. The merit or lack of merit in the incumbent's record-and the degree of renewal expectancy to which he is thereby entitled-and all the other factors are all to be weighed, all at once, all with an eye toward the public interest. Nothing is removed from the scales until the balance is struck. Again, we are convinced the Commission acted properly in this case. See, e.g., 86 F.C.C.2d at 1015-18.
 
 
 [17]
 1 F.C.C.2d 393 (1965). We stated in Central Florida I, 598 F.2d at 56, that the "Commission may not, comfortably with the hearing mandate of (47 U.S.C. § 309(e) (1976)), practically abandon the 1965 criteria without providing an alternate scheme affording a thorough and intelligible comparison." For the reasons stated in this opinion, we believe the new scheme to afford such a comparison
 
 
 [18]
 86 F.C.C.2d at 1012 n.91
 
 
 [19]
 Id. at 1013 (emphasis added). Note that each of these factors was cited by the Supreme Court in NCCB, 436 U.S. at 805, 807, 809, 98 S.Ct. at 2117, 2118, 2119
 
 
 [20]
 This parallels, for instance, the ICC's mandate. See, e.g., May Trucking Co. v. United States, 593 F.2d 1349, 1356 (D.C.Cir.1979) ("Congress designed the Interstate Commerce Act to benefit the people, not to create protected monopolies for those who profess to serve the public" (footnote omitted).) Our antitrust laws similarly dictate that competition-and, thereby, consumers -are to be protected rather than competitors. See generally R. Bork, The Antitrust Paradox (1978)
 
 
 [21]
 Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 390, 89 S.Ct. 1794, 1806, 23 L.Ed.2d 371 (1969) (citations omitted)
 
 
 [22]
 FCC v. Sanders Bros. Radio Station, 309 U.S. 470, 475, 60 S.Ct. 693, 697, 84 L.Ed. 869 (1940)
 
 
 [23]
 Office of Communications of the United Church of Christ v. FCC, 359 F.2d 994, 1003 (D.C.Cir.1966)
 
 
 [24]
 598 F.2d at 61-62
 
 
 [25]
 Central Florida I, 598 F.2d at 50
 
 
 [26]
 Id. at 59
 
 
 [27]
 Id. at 50 (quoting earlier proceeding, 60 F.C.C.2d 372, 422 (1976)). We think it would be helpful if at some point the Commission defined and explained the distinctions, if any, among: substantial, meritorious, average, above average, not above average, not far above average, above mediocre, more than minimal, solid, sound, favorable, not superior, not exceptional, and unexceptional-all terms used by the parties to describe what the FCC found Cowles' level of performance to have been. We are especially interested to know what the standard of comparison is in each case. "Average" compared to all applicants? "Mediocre" compared to all incumbents? "Favorable" with respect to the FCC's expectations? We realize that the FCC's task is a subjective one, but the use of imprecise terms needlessly compounds our difficulty in evaluating what the Commission has done. We think we can discern enough to review intelligently the Commission's actions today, but if the air is not cleared or, worse, becomes foggier, the FCC's decisionmaking may again be adjudged "opaque to judicial review."
 
 
 [28]
 86 F.C.C.2d at 1006-08 (quoting earlier proceeding, 62 F.C.C.2d at 955-56)
 
 
 [29]
 The Commission concluded on the mail fraud issue that the subsidiaries involved in the mail fraud and Cowles "are linked only by their ... relationship with" their common parent
 The broadcast facilities were not used to promote mail fraud and there was no integration of operating personnel between the (subsidiaries involved in mail fraud) and broadcast subsidiaries. Consequently, we adhere to our conclusion that the activities of the (former) do not portend Cowles' likely future performance as a broadcast licensee. Therefore, neither disqualification nor a comparative demerit is warranted.
 
 
 [86]
 F.C.C.2d at 1002 (emphasis added). The Commission also found that there was no basis to conclude that the principal common officers of Cowles and the implicated subsidiaries participated in or encouraged any misconduct, and that the mail fraud inquiry had not been curtailed in any significant way, id. at 998-1004-two other reservations we had in Central Florida I, 598 F.2d at 52. We think the Commission's findings here are adequately supported
 
 
 [30]
 86 F.C.C.2d at 1009-10
 
 
 [31]
 Id. at 1015. The Supreme Court upheld a similar decision by the FCC to weigh diversification more heavily for prospective, as opposed to existing, licensees. NCCB, 436 U.S. at 803-809, 98 S.Ct. at 2116-2119. Thus, "diversification will be a relevant but somewhat secondary factor." Id. at 809, 98 S.Ct. at 2119. See also Citizens, 447 F.2d at 1208-09 n.23
 The FCC argues that diversification and integration should not be given "heavy weight in the comparative renewal context" since "(c)hallengers could easily structure their proposals to be superior to the incumbent's," resulting in possible "substantial restructuring of the industry with possible disruptions of service" and a loss of "incentive to provide quality programming." 86 F.C.C.2d at 1016.
 Here we have a caveat. We do not read the Commission's new policy as ignoring integration and diversification considerations in comparative renewal hearings. In its brief at page 6 the Commission states that "an incumbent's meritorious record should outweigh in the comparative renewal context a challenging applicant's advantages under the structural factors of integration and diversification." Ceteris paribus, this may be so-depending in part, of course, on how "meritorious" is defined. But where there are weights on the scales other than a meritorious record on the one hand, and integration and diversification on the other, the Commission must afford the latter two some weight, since while they alone may not outweigh a meritorious record they may tip the balance if weighed with something else. See Citizens, 447 F.2d at 1208-09 n.23.
 That, of course, is precisely the situation here, since the main studio move violation must also be balanced against the meritorious record. The Commission may not weigh the antirenewal factors separately against the incumbent's record, eliminating them as it goes along. It must weigh them all simultaneously. See note 16 supra. We are convinced, however, despite some ambiguous passages like the one just quoted in the preceding paragraph, that the Commission has followed the correct procedure here. See, e.g., 86 F.C.C.2d at 1018. Thus the Commission's conclusion that diversification and integration are to be given "lesser weight" than renewal expectancy does not mean that they were or will be given no weight. The relative weight to be given these factors will vary, depending on how much or how little diversification or integration is at stake. Here, as stated in the text, the Commission did consider the degree of Central's integration advantage ("slight") and diversification advantage ("clear"). 86 F.C.C.2d at 1009-10.
 
 
 [32]
 866 F.C.C.2d at 1017
 
 
 [33]
 Id. at 1005-06 (emphasis added). See also id. at 1017
 
 
 [34]
 Id. at 1017
 
 
 [35]
 Id. at 1006 (quoting earlier proceeding, 62 F.C.C.2d at 955-56)
 
 
 [36]
 Id. at 1018
 
 
 [37]
 Letter of Daniel M. Armstrong, FCC Associate General Counsel, to George A. Fisher, Clerk, U. S. Court of Appeals, District of Columbia Circuit (May 4, 1982) (hereinafter "Letter of Daniel M. Armstrong"). See also Central Florida I, 598 F.2d at 61
 
 
 [38]
 In re Applications of Simon Geller and Grandbanke Corp., FCC Docket Nos. 21104-05 (Released 15 June 1982). We intimate no view at this time, of course, on the soundness of the Commission's decision there; we cite it only as demonstrating that the Commission's new approach may prove to be more than a paper tiger
 
 
 [39]
 Id. at 15, 20-21 (emphasis added)
 
 
 [40]
 Thus, the three justifications given by the Commission for renewal expectancy, p. 507 supra, should be remembered by the FCC in future renewal proceedings and, where these justifications are in a particular case attenuated, the Commission ought not to chant "renewal expectancy" and grant the license
 
 
 [41]
 See Letter of Daniel M. Armstrong, supra note 37; Central Florida I, 598 F.2d at 61; Letter of Joseph F. Hennessey, Counsel for Central Florida, to George A. Fisher, Clerk, U. S. Court of Appeals, District of Columbia Circuit (May 17, 1982)
 
 
 [42]
 Counsel for the FCC conceded at oral argument, "I grant you, (competitors) wouldn't challenge the (incumbent) they thought was exceptional or far above average." The dissent from the Commission's decision declared it a "readily apparent fact that competing applicants file against only the ne'er-do-wells of the industry." 86 F.C.C.2d at 1055 n.99