MONROE COMMUNICATIONS
CORPORATION, Petitioner,

v.

FEDERAL COMMUNICATIONS
COMMISSION, Respondent,

Harriscope of Chicago, Inc., et al., a
Joint Venture d/b/a Video 44,
Intervenors.

No. 89–1092.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 16, 1990.

Decided April 10, 1990.

---

Harry F. Cole, with whom Gene A. Bechtel, was on the brief, for petitioner.

Sue Ann Preskill, Counsel, F.C.C., with whom Robert L. Pettit, Gen. Counsel, and Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., were on the brief, for respondent. Diane S. Killory, Attorney, F.C.C., also entered an appearance for respondent.

N. Frank Wiggins, with whom Stanley B. Cohen and J. Brian De Boice were on the brief, for intervenors.

Before WALD, Chief Judge, SILBERMAN and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

Concurring opinion filed by Circuit Judge SILBERMAN.

SENTELLE, Circuit Judge:

Monroe Communications Corporation ("Monroe") petitions this Court for review of a decision of the Federal Communications Commission ("FCC" or the "Commission") awarding Video 44 ("the station") a renewal of its license to operate station WSNS–TV in Chicago, Illinois, and to deny Monroe's mutually exclusive application for a construction permit. Specifically, Monroe contends that the Commission's award of a renewal expectancy to Video 44 was arbitrary and capricious and that the Commission improperly refused to consider evidence of obscene broadcasts by Video 44.

We find that the Board arbitrarily and capriciously awarded a renewal expectancy to Video 44 in light of record evidence of Video 44's marked and apparently permanent cutback in non-entertainment programming through the latter part of its prior license period. Further, we conclude that the Commission arbitrarily failed to consider in the license renewal proceeding allegations of obscene broadcasts by Video 44. We therefore grant Monroe's petition and remand this case to the Commission

for further proceedings consistent with this opinion.

## I. REGULATORY BACKGROUND

██ When choosing among mutually exclusive applicants for broadcast facilities, the Commission considers a number of factors to predict which applicant will likely best serve the public interest. When all competitors are applicants for an initial license, the Commission focuses on, among other things, each applicant's diversification, meaning the number of other media outlets already owned by the applicant, and integration, meaning the extent to which the owners of the applicant will be involved in the management of the station. *See Policy Statement on Comparative Broadcast Proceedings*, 1 F.C.C.2d 393 (1965). When one of the applicants already has a license for the station in issue and is seeking renewal of its license, the Commission may grant that applicant a "renewal expectancy" which may be sufficient to outweigh the advantages a challenger may have with respect to diversification and integration. *Cowles Broadcasting, Inc.*, 86 F.C.C.2d 993, 1015 (1981) (*Cowles II*), *aff'd sub nom., Central Florida Enterprises, Inc. v. FCC*, 683 F.2d 503 (D.C.Cir.1982), *cert. denied*, 460 U.S. 1084, 103 S.Ct. 1774, 76 L.Ed.2d 346 (1983) (*Central Florida II*).

██ An incumbent applicant may be entitled to a renewal expectancy if its performance during the preceding license term has been " 'substantial,' " meaning " 'sound, favorable and substantially above a level of mediocre service which might just minimally warrant renewal.' " *Cowles II*, 86 F.C.C.2d at 1006 (quoting *Cowles Florida Broadcasting, Inc.*, 62 F.C.C.2d 953, 955–56 (1977)). In deciding whether to award a renewal expectancy, the Commission focuses on non-entertainment programming broadcast by the station, including news, public affairs, and public service announcements. *See, e.g., Radio Station WABZ, Inc.*, 90 F.C.C.2d 818, 840–42 (1982), *aff'd sub nom. Victor Broadcasting, Inc. v. FCC*, 722 F.2d 756 (D.C.Cir. 1983). A licensee is expected to ascertain and respond to community needs and prob-

lems in its non-entertainment programming in order to earn a renewal expectancy. *Radio Station WABZ*, 90 F.C.C.2d at 840–42; *In re Simon Geller*, 90 F.C.C.2d 250, 270–71 (1982), *rev'd on other grounds sub nom. Committee for Community Access v. FCC*, 737 F.2d 74 (D.C.Cir.1984); *In re WPIX, Inc.*, 68 F.C.C.2d 218, 402 (1974).

The Commission has articulated three purposes underlying its renewal expectancy policy. First, incumbents' performances are proven, whereas challengers have only paper proposals to offer: "Thus, not only might replacing an incumbent be entirely gratuitous, but it might even deprive the community of an acceptable service and replace it with an inferior one." *Cowles II*, 86 F.C.C.2d at 1013. Second, "[l]icensees should be encouraged through the likelihood of renewal to make investments to ensure quality service." *Id.* Third, "[c]omparing incumbents and challengers as if they were both new applicants could lead to a haphazard restructuring of the broadcast industry...." *Id.*

This Court has condoned some degree of renewal expectancy for a broadcaster's meritorious past record, noting that " 'the incumbent's past performance is some evidence, and perhaps the best evidence, of what its future performance would be.' " *Central Florida II*, 683 F.2d at 506 (quoting *Central Florida Enterprises v. FCC*, 598 F.2d 37, 55 (D.C.Cir.1978), *cert. dismissed*, 441 U.S. 957, 99 S.Ct. 2189, 60 L.Ed.2d 1062 (1979). The Commission, too, has indicated that a station's past performance is relevant primarily insofar as it is probative of the station's likely future performance. *Simon Geller*, 90 F.C.C.2d at 271.

This Court has also expressed concern, though, that the Commission has in the past been too reluctant to deny renewals to incumbent television license holders in comparative challenges. *Central Florida II*, 683 F.2d at 510. In *Central Florida II* we warned the FCC not to "chant 'renewal expectancy' and grant the license" in a case where the justifications underlying the renewal expectancy policy are attenuated. *Id.* at 510 n. 40.

## II. FACTUAL BACKGROUND AND PROCEEDINGS BELOW

At the beginning of the previous license term, in December, 1979, licensee Video 44 offered conventional television programming and broadcast a substantial amount of non-entertainment programming. During the 1979–1982 license term, Video 44 gradually converted the station to a subscription television service ("STV"),[1] offering STV programming for at least 23 hours each day by the end of the term. The station continued, though, to broadcast conventional, non-entertainment programming from 6:00 a.m. to 7:00 a.m., Monday through Friday, showing a nationally distributed program called "Health Field" and a show about local and statewide issues called "Illinois Press." By the end of the license term, Video 44 had essentially closed down its local production facilities. Video 44's other broadcasts included a substantial number of "adult" films which contained nudity, offensive language, and various sexual acts.

The Administrative Law Judge ("ALJ") who conducted the initial comparative renewal hearing between Video 44 and Monroe concluded in the Initial Decision that Video 44 was not entitled to a renewal expectancy. *Video 44*, 102 F.C.C.2d 419 (ALJ 1985). In so deciding, the judge focused on the latter part of the previous license term, in which Video 44 cut back its non-entertainment program markedly, because he concluded that Video 44's performance after switching over to the STV format was probably more probative of its likely future performance than its programming before the format change. *Id.* at 458. Absent any renewal expectancy in favor of Video 44, the ALJ concluded that the license should be awarded to Monroe because the factors of integration and diversification favored Monroe. *Id.* at 462–63.

Upon Video 44's petition for review, the Commission's Review Board did two things. First, the Review Board sought guidance from the full Commission on the question of whether the standards applicable in a conventional comparative renewal licensing proceeding are also applicable to an incumbent license renewal applicant which had provided an STV service during the license term under review. *Video 44*, 102 F.C.C.2d 408, 412–13 (Rev.Bd.1985) (*"Review Board I"*). Second, the Review Board added, *sua sponte*, the issue of whether Video 44 had transmitted obscene material in violation of 18 U.S.C. § 1464 ("the obscenity question"). *Id.* at 410–12.

The Commission responded that STV and conventional licensees have the same obligation to ascertain community needs and interests and to present programming in response to those needs and interests. *Video 44*, 103 F.C.C.2d 1204, 1207–08 (1986) (*"Video 44 I"*). Second, the Commission deleted the obscenity question, concluding that the Commission should not review allegations that a licensee has broadcast obscene material unless a local prosecution has already found that the material was obscene. *Id.* at 1208–11. On reconsideration, the Commission modified its decision with respect to the latter issue, explaining that it would consider obscenity allegations in renewal proceedings, but only where those allegations were raised contemporaneously with the allegedly obscene broadcasts. *Video 44*, 3 F.C.C.Rcd 757, 759 (1988) (*"Video 44 II"*).

Following the full Commission's decisions on the significance of the provision of STV service and the obscenity issue, the Review Board reversed the ALJ and concluded that Video 44's non-entertainment programming throughout the previous license term, taken as a whole, merited a renewal expectancy. *Video 44*, 3 F.C.C.Rcd 3587, 3592 (Rev.Bd.1988) (*"Review Board II"*). The Review Board further concluded that this renewal expectancy was sufficient to outweigh the advantage Monroe may have had with respect to diversification and integration. *Id.*

The full Commission then agreed with the Review Board that Video 44's performance throughout the previous license term,

---

**1.** STV involves the transmission of a scrambled signal which, for a fee, subscribers may un-scramble with a decoder. *See Subscription Television Service,* 90 F.C.C.2d 341 n. 1 (1982).

taken as a whole, was substantial and merited a renewal expectancy. *Video 44,* 4 F.C.C.Rcd 1209 (1989) (*"Video 44 III"*). The Commission explained that it did not want to give too much weight to the end-of-term drop in Video 44's non-entertainment programming because that drop stemmed in part from Video 44's experimentation with an STV format. *Id.* at 1212.

Monroe now petitions this Court challenging the FCC's award of a renewal expectancy to Video 44, contending that Video 44's programming, particularly during the latter part of the license period, was not substantial. Monroe further argues that the FCC's refusal to consider Video 44's allegedly obscene and indecent programming in the comparative renewal hearing was arbitrary and capricious.

### III. THE RENEWAL EXPECTANCY

■ The Commission's primary justification for considering an applicant's past record and awarding a renewal expectancy for a meritorious past performance is that the applicant's past record is probably the best available evidence of its likely future conduct. *Central Florida II,* 683 F.2d at 506. The renewal expectancy analysis is thus largely predictive, rather than retrospective. The Commission has repeatedly emphasized that an incumbent runs on its record as a whole, since some briefer period of time may not give the Commission a representative picture of the incumbent's past performance. *Storer Broadcasting Company,* 60 F.C.C.2d 1097, 1103 n. 5 (1976); *The Evening News Association,* 58 F.C.C.2d 392, 396–97 (1976); *Universal Communications Corp.,* 56 F.C.C.2d 445, 448 n. 5 (1975).

The Commission has also recognized, though, that the latter part of a license term may be more probative of a licensee's likely future performance, particularly where that licensee has instituted a format change during the course of the license term. *United Broadcasting Company, Inc.,* 100 F.C.C.2d 1574, 1581 (1985). In *United,* the Commission found that after a station's format change, its performance was substantial and that a renewal expect-

ancy was warranted. Responding to the argument that the format change did not occur until more than one-third of the license term had expired, the Commission stated that it agreed with the Board that the station's most recent performance was most probative. *Id.* The Commission's position in *United* is consistent with this Court's insistence that the renewal expectancy be factored in solely for the benefit of the public, not for that of incumbent broadcasters. *Central Florida II,* 683 F.2d at 507. Where a broadcaster has during the early part of its license term performed substantially, but where it appears unlikely to perform substantially in the future, it serves no public interest to award a renewal expectancy to that broadcaster. Thus, while a licensee runs on its record as a whole, each day in a given license period is not necessarily equally probative in the renewal expectancy analysis. Where a licensee has instituted a dramatic and permanent format change, its programming following that change is more probative of its likely future performance than its programming prior to that change.

When it conducted its renewal expectancy analysis, the Commission had no reason to believe that Video 44's transformation into an STV broadcaster was anything but permanent. Consequently, when predicting Video 44's likely future performance, the Commission should have focused on its performance after it became a nearly full-time STV broadcaster. In the Initial Decision, the ALJ properly concluded:

> In light of the complete change in program operation, reliance on data based on programming which has been abandoned would not serve the public interest since it is not an indicator of WSNS–TV's prospective programming. In evaluating WSNS–TV's record, it is clear that the programming carried by WSNS–TV in the period following its decision to commence virtual wall-to-wall STV programming, rather than its overall programming during the entire license term, is the most reliable predictor of future service to the public.

102 F.C.C.2d at 458 (footnote omitted).

The Review Board and the full Commission explicitly rejected the ALJ's approach

and, in so doing, acted arbitrarily. The Review Board noted, in the decision ultimately affirmed by the full Commission, that the ALJ had adopted an unprecedented and unjustifiable approach by focusing primary attention upon the last 13 to 26 weeks of Video 44's operation. *Review Board II,* 3 F.C.C. Rcd at 3588–89. The Review Board stated, "[W]e disagree with the ALJ that an evaluation of WSNS–TV's past programming record in the light of the Commission's *United Broadcasting* decision mandates the conclusion that its 'virtual wall-to-wall STV programming [after August 23, 1982], rather than its overall programming during the entire license term, is the most reliable predictor of future service to the public....'" *Id.* at 3589. Similarly, the Commission, in upholding the Review Board's decision, stated, "We agree with the Board that the renewal expectancy determination in this case should be based on WSNS–TV's programming throughout the license term and not solely on its performance after it was converted to almost full-time STV operation." *Video 44 III,* 4 F.C.C. Rcd at 1211. In light of the purpose of the renewal expectancy analysis—to predict a broadcaster's likely future performance based on its past programming—the Commission arbitrarily minimized the significance of the most probative portion of Video 44's previous license period.

Had the Commission properly weighted the station's performance following its conversion to STV format, it may well not have awarded Video 44 a renewal expectancy. The Commission found that through the full final year of its license term Video 44 offered .08 percent news, 2.57 percent public affairs, and only 5.84 percent other non-entertainment programming. *Video 44 III,* 4 F.C.C. Rcd at 1210. These figures place Video 44 near the bottom of the pack, relative to other Chicago stations, in terms of news, public affairs, and other non-entertainment programming. By the very end of its license period, Video 44 had scaled back its non-entertainment programming to five hours per week and had discontinued local production. Given that the license expectancy analysis focuses on the

incumbent licensee's responsiveness to the ascertained problems and needs of its community, *Simon Geller,* 90 F.C.C.2d at 271, the Commission was arbitrary in awarding Video 44 a renewal expectancy in light of record evidence of a strong downward trend in Video 44's responsiveness to community needs in the form of news and non-entertainment programming. We do not mean to displace the Commission's administrative role, but do direct the Commission to evaluate Video 44's application in light of the considerations laid out in this opinion.

### IV. THE OBSCENITY ISSUE

■ Congress has empowered the Commission to enforce the statutory prohibition against broadcasting obscenity found in 18 U.S.C. § 1464 ("the obscenity statute"). First, the Commission may revoke a station's license or construction permit for a violation of the obscenity statute. 47 U.S.C. § 312(a)(6). Second, the Commission may exact a forfeiture or other sanction upon a licensee that has violated the obscenity statute. 47 U.S.C. § 503(b)(1)(D). This Court has affirmed the Commission's power to determine that broadcasts are, in fact, obscene. *Illinois Citizens Committee for Broadcasting v. FCC,* 515 F.2d 397, 404 (D.C.Cir.1974).

Although the Commission generally scrutinizes only non-entertainment programming in conducting its renewal expectancy evaluation, Video 44 offered the ALJ evidence which described in detail its entertainment programming. Monroe objected to consideration of that evidence, in part because it offered an incomplete picture of Video 44's entertainment programming. Monroe offered an exhibit evidencing violent and sexually explicit entertainment programming by Video 44 to complete the picture. Given the options of either withdrawing its own entertainment programming proofs so that Monroe's offerings would also be rejected, or having the Commission consider both parties' evidence concerning Video 44's entertainment programming, Video 44 chose the latter course. Ultimately, though, the ALJ did not consid-

er Video 44's sexually-oriented and violent programming in deciding to award Video 44 a renewal expectancy. The Review Board added the obscenity question on its own upon review of the ALJ's decision. *Review Board I*, 102 F.C.C.2d at 410–13.

When it first addressed the obscenity question in this case, the full Commission acknowledged that in the past it had exercised concurrent jurisdiction to enforce 18 U.S.C. § 1464, but explained that upon further reflection it had decided to exercise greater restraint in this area, deferring to local authorities to determine in the first instance whether material is obscene. *Video 44 I*, 103 F.C.C.2d at 1209–10. Subsequent to that decision, the Commission did make a finding of indecency under § 1464 in *Infinity Broadcasting Corporation*, 2 F.C.C. Rcd 2705 (1987). The Commission denied in *Infinity* that it was backtracking on its *Video 44 I* stance, explaining that indecency, in contrast to obscenity, does not require deference to local community standards.

Finally, upon reconsideration of its first *Video 44* ruling, the Commission determined that it would not consider allegations of obscenity for the first time in the context of renewal proceedings, but that it would consider sufficiently specific complaints of obscenity raised contemporaneously with the allegedly obscene broadcasts. *Video 44 II*, 3 F.C.C. Rcd at 759. The Commission explained that the contemporaneous complaint requirement would ensure that allegations that a licensee has broadcast obscene material would be raised at the time of broadcast or soon thereafter. Such a rule would guarantee the Commission flexibility in responding to the obscenity allegations in an appropriate manner; would enable the Commission to put the licensee on notice that its broadcasts were unacceptable, thus minimizing the chilling effect on a broadcaster's disposition to air protected speech that might result from allowing allegations of obscenity to be raised for the first time in the context of comparative renewal hearings, and would

ensure that allegations of obscenity are judged by contemporary community standards, as required by *Miller v. California*, 413 U.S. 15, 24, 93 S.Ct. 2607, 2615, 37 L.Ed.2d 419 (1973), rather than the standards of a later period. *Id.*

Heeding its newly announced policy, the Commission declined to consider evidence of allegedly obscene broadcasts by Video 44 in this case. The Commission rejected Monroe's evidence on the obscenity issue because Monroe's offer failed to comply with the contemporaneous complaint requirement. Further, the Commission declined to give weight to those citizen complaints that were raised during the license term because none presented the prima facie showing required before the Commission will initiate an investigation into a possible obscenity violation. *Video 44 II*, 3 F.C.C. Rcd at 759. We conclude that the Commission acted arbitrarily on both counts.

First, the Commission did not adequately justify its adoption and application of a contemporaneous complaint requirement. In awarding broadcast licenses, the Commission is charged with considering and promoting the public interest. 47 U.S.C. § 309(a). Obscene broadcasting is proscribed by statute as contrary to the public interest. 18 U.S.C. § 1464. Yet the Commission has chosen to single out this one category of broadcasts for particularly ginger treatment, severely limiting the extent to which it will consider this category in its renewal expectancy analysis. In so doing, after a good deal of equivocation, the Commission has announced a new policy which departs from its prior policy of considering allegations of obscenity in renewal expectancy evaluations.[2] The Commission must supply a reasoned analysis explaining this departure from its prior policies and standards concerning the consideration of allegations of obscenity in renewal proceedings. *Greater Boston Television Corporation v. FCC*, 444 F.2d 841, 852 (D.C.Cir. 1970), *cert. denied*, 403 U.S. 923, 91 S.Ct.

---

**2.** The Commission concedes that it previously was willing to consider allegations of obscene or indecent programming for the first time in

renewal expectancy hearings, citing *WGBH Educational Foundation*, 69 F.C.C.2d 1250, 1253–54 (1978), as an example.

2229, 29 L.Ed.2d 701 (1971). We conclude that it has failed to do so.

The Commission first explains that the contemporaneous complaint rule allows the Commission to remedy potentially ongoing violations in a flexible and timely manner. The Commission might be able to require that complaints about obscene broadcasts be made contemporaneously in order for the Commission to act under the obscenity statute. However, the fact remains that obscene broadcasts, like a number of other factors, bear on the public interest, as evidenced by the obscenity statute. The Commission is supposed to consider the public interest in evaluating license applications. The Commission cannot reasonably carve out one factor bearing on the public interest and claim that that factor, in contrast to the others, can only be considered in a renewal expectancy evaluation if that factor has been raised previously. We are not prohibiting the Commission from considering whether there were any contemporaneous complaints in determining the weight it gives to claims of obscene broadcasts, but merely conclude that the Commission's desire flexibly to remedy ongoing violations of the obscenity statute does not justify altogether prohibiting the consideration of a factor clearly bearing on the public interest at the time the Commission reviews a station's license renewal application.

Further, the Commission argues that absent a contemporaneous complaint rule, broadcasters may be reluctant to present controversial material if they face the possibility of losing their license years after presenting the programming without notice of potential action and the opportunity to modify their conduct. Certainly, though, a broadcaster is no more chilled by the prospect of the eventual loss of its license in a renewal proceeding than it is by the possibility of an immediate forfeiture or loss of its license stemming from an immediate adjudication. The Commission has not explained why the Commission should absolutely bar consideration of noncontemporaneous complaints in renewal hearings rather than just discount the weight it gives those complaints in light of their tardiness.

Finally, the Commission argues that the contemporaneous complaint requirement ensures that allegedly obscene material is judged by *contemporary* community standards, as required by *Miller v. California*, 413 U.S. at 24, 93 S.Ct. at 2615, rather than the standards of a period subsequent to the broadcast. The Commission cannot seriously suggest that the time lag between an allegedly obscene broadcast and the renewal hearing would necessarily be substantially greater than that between a broadcast and the ultimate adjudication, outside the context of a renewal proceeding, of allegations that the broadcast was obscene. The Commission has on some occasions taken years to even initiate inquiries in response to complaints of obscenity. *See, e.g.*, Letter to Pacific and Southern Company, Inc. from Edythe Wise, Chief, Complaints and Investigations Branch, dated October 26, 1989 (initiating inquiry in response to October, 1987 complaint about a September, 1987 broadcast). In any event, the contemporary standard is *never* applied *at* the time of the event. Just as juries and trial judges must look back to the time of event from the time of trial in criminal obscenity cases, so must the Commission in whatever proceeding it employs to adjudicate the question. This rationale of the Commission's rule not only is not sufficient, but it makes no sense whatsoever.

The Commission's justifications for refusing to consider Monroe's evidence were inadequate to satisfy the Commission's responsibility to offer a reasoned explanation for its actions. We do not conclude that the Commission is without statutory power to adopt a policy of considering only contemporaneous complaints in comparative renewal hearings. We do conclude, however, that the Commission has failed to adequately explain and justify its adoption of such a policy in this case. Further, if the Commission were able to adequately justify its contemporaneous complaint policy, it would still be required to provide the public with notice of this policy so that potential complainants would not be unfairly barred from presenting their complaints

due to a procedural rule of which they had no knowledge.

Moreover, the Commission acknowledged that it had received some contemporaneous complaints during Video 44's previous license period, but it found those complaints insufficiently specific to warrant further investigation. The Commission explained that, partly in light of First Amendment concerns, it would only investigate allegations of obscenity that alleged sufficient facts about a specifically identified program to allow the Commission to determine that a violation may have occurred. *Video 44 II,* 3 F.C.C. Rcd at 760 n. 5 & n. 6. We agree that the Commission should not be required to investigate every generalized complaint alleging that a broadcaster offers obscene programming. However, to require ordinary citizens to, in the first instance, set forth allegations constituting a prima facie case of obscenity, as defined in *Miller v. California,* 413 U.S. at 24, 93 S.Ct. at 2615, is arbitrary. For instance, among the complaints the Commission declined to consider in its renewal expectancy analysis was a timely letter from a Chicago resident who reported being shocked to see a broadcast by Video 44 clearly depicting adults engaged in sexual acts. The letter specified the date and time of the broadcast. *See* Monroe Communications Corporation Hearing Exhibit No. 30, Joint Appendix at 417. To ignore this citizen complaint in the license renewal proceedings, without at least learning more about the broadcast, because the complaint did not make out a legally sufficient claim of obscenity was arbitrary.

## V. CONCLUSION

When the Commission conducted its renewal expectancy analysis, it arbitrarily failed to give ample weight to the decline in Video 44's non-entertainment programming during the latter part of its previous license term. We thus remand this case to the Commission with instructions to focus on the downward trend in Video 44's non-entertainment programming through the latter stages of the previous license period in order to predict Video 44's likely performance in the license period at issue here. We also instruct the Commission to either consider the evidence of obscene broadcasts by Video 44 that was offered by Monroe and that appeared in some contemporaneous citizen complaints, or to better justify its refusal to do so.

SILBERMAN, Circuit Judge, concurring:

I completely concur in the majority opinion, but I would like to add a few words to Part III's discussion of the renewal expectancy. It appears to me that virtually *all* the factors upon which the FCC relies in awarding or renewing broadcast licenses are in a sense fictitious; they are not really predictive of programming substance. Nor is it apparent to me that it is possible to articulate a public interest in any particular kind of programming (such as "nonentertainment"). When I sit on these cases, therefore, I feel somewhat like Alice in Wonderland. We have no alternative as a reviewing court, however, but to treat the FCC's elaboration of the public interest as if it made sense and therefore to insist on a consistent application of what we may really think are fanciful factors.

Quite obviously the FCC shrinks from the prospect of taking the license away from the incumbent, but in the absence of a system whereby a license holder pays the public for the license (as in an auction) it is hard to see how the FCC can justify the weight it places on incumbency in this case. The Commission appears to act as if incumbency and the renewal expectancy were a property interest—which it is *not.*